The City of Hartford was in gross fault, irrespective of any other question in the case, in not slowing sooner than she did, and in not stopping and reversing sooner than she did. I do not think that the fact that both vessels were running much nearer to the Brooklyn piers than to the New York piers. can, in this case be taken into account, so as to charge either of them with fault in that respect. Their positions in that regard did not contribute to the collision, for each vessel saw the other in abundant season for the collision to have been avoided by proper manoeuvres thereafter.

## Case No. 2,749.

### The CITY OF HARTFORD.

[7 Ben. 350.][1]

District Court, S. D. New York. June, 1874.

COLLISION IN HELL GATE—STEAMER AND SCHOONER—KEEPING COURSE—CHOICE OF COURSES.

1. A steamboat going eastward against an ebb tide. through Hell Gate, at night, as she approached the bend in the channel at Hal-

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

lett's Point, saw the red light of a schooner coming through the Gate. The wind was about north northwest. The light was seen on the starboard bow of the steamboat. The latter went on and ported her wheel. so as to go around the Point and meet the tide head on. Just before she reached the tide. the schooner, being then about two or three hundred feet from the steamboat, and on the steamboat's port bow,. starboarded her helm, and let go her sheet. to turn around the Point into the channel in which the steamboat was. This movement brought the green light of the schooner into view from the steamboat, and shut in her red light, whereupon the engine of the steamboat was stopped, and her helm was put amidships, but the vessels came into collision, the stem of the steamboat striking the starboard side of the schooner aft of the main rigging. *Held*, that. in that difficult and dangerous channel, the steamboat was in fault in not waiting. before turning Hallett's Point, until she knew whether the schooner was intending ,o turn into the channel in which the steamboat was, or not.

[Cited in The City of Springfield, 26 Fed. 161;. The Dasori, 47 Fed. 331.]

2. Although the schooner intended all the time to take the east channel, and took the necessary and proper steps to turn into it, and in that sense kept her course, yet, seeing the steamboat as she did, and knowing that the latter had but one course to take if she kept on, while she herself had the choice of turning into the east channel or taking either one of two other channels. she was in fault in not holding herself up to the wind, and refraining from starboarding and letting her sheet go, until she had gone by the steamboat.

[Cited in The Iron Chief, 53 Fed. 512.]

3. Both vessels were in fault, and the damages must be apportioned.

In admiralty.

W. R. Darling, for libellants.

E. H. Owen, for claimants.

BLATCHFORD, District Judge. On the 2d of May, 1872, at about midnight, the schooner William R. Knapp, owned by the libellants, and loaded with a cargo of sand, collided with the steamboat City of Hartford, off Hallett's Point, in Hell Gate, and she and her cargo were thereby sunk and totally lost. The schooner was proceeding towards New York. and the City of Hartford was on a trip from New York to New Haven. The starboard side of the schooner was struck by the stem of the steamboat. The schooner, just before the collision, had starboarded her helm and let her main sheet run off so as to go around Hallett's Point, and down the east channel, which was the same channel the steamboat was in. The wind was about north northwest, a fresh breeze, and the tide was ebb. The answer alleges,. that the schooner improperly and unexpectedly changed her course, and did not have a competent lookout, properly stationed and faithfully attending to his duties; that, if the schooner had continued the course upon which she was heading when first discovered, the steamboat could and would have passed her on her port side, at a safe distance; and that, in so changing her course, the schooner so baffled the navigation of the steamboat, as to prevent her keeping away

from the schooner, and as to render a collision inevitable.

The steamboat had her proper lights set and burning. She was a large vessel, 270 feet long. She had gone up on the east side of Blackwell's Island. Her master, her pilot and two wheelsmen were in her pilothouse. She had a lookout at her bow. When she had reached a point two or three lengths below Flood Rock, her master and her pilot saw the red light of the schooner bearing about three points on the starboard bow of the steamboat. At that time the steamboat was heading about northeast. The schooner was then some distance to the eastward of Hallett's Point, and below Negro Point. At Flood Rock, the steamboat, as it was necessary and proper for her to do, to go around Hallett's Point, and meet the ebb tide there stem on, ported her wheel, and swung gradually to starboard on a swing which, by the time she met the tide at the Point, would amount to a change of her heading so that she would head east, being a change of four points. Just before the steamboat reached the tide at the Point, and when the two vessels were not more than the length of the steamboat apart, the green light of the schooner came into the view of those in the pilot-house of the steamboat, and immediately afterwards the red light of the schooner went out of their view, and the collision ensued. The green light of the schooner, when it so appeared, appeared a little on the port bow of the steamboat, and the red light of the schooner, when it disappeared, was a little on the port bow of the steamboat. Notwithstanding the swinging of the steamboat to starboard at the time, the green light of the schooner crossed the bow of the steamboat, from her port to her starboard, so that the schooner was struck just aft of her main rigging. As soon as the green light of the schooner came into view, the engine of the steamboat was stopped, and her wheel was let go to midships. She was in a rapid and dangerous tide, the schooner was sailing at the rate of seven miles an hour, and the collision came so soon after the green light of the schooner appeared, that it is quite evident that nothing which the steamboat could have done, after she saw the green light of the schooner, would have avoided the collision.

To those on the schooner, the green and white lights alone of the steamboat were visible, until just before the collision, when the steamboat's red light also came into their view.

The channel at the place of collision is narrow, the tide strong, and the navigation intricate and dangerous. The entire bend around the Point is six points, from northeast to east southeast, or from west northwest to southwest. The tide was favorable for the schooner; and the steamboat, seeing the red light of the schooner a considerable distance above Hallett's Point, when the steamboat was below Flood Rock, could not tell whether the schooner was intending to go through the east channel, the middle channel, or the main ship channel, for the schooner was at a point where she might still have elected to go through either one of the three channels, and she was free to do so. It was the duty of the steamer to avoid the schooner, and it was the duty of the schooner to keep her course, and not to embarrass the movements of the steamboat. It would have been very easy for the steamboat, seeing the red light of the schooner, and uncertain whether the schooner was, or was not, intending to go through the east channel, to stop and reverse, before porting, at Flood Rock, so as, by the aid of the adverse tide, to check her speed, until the movements of the schooner should be developed. In such case, the steamboat being necessarily to the westward, with a view to go, by porting, around Hallett's Point, the schooner, coming down the east channel, would have passed to the eastward of the steamboat. Even if there had been no collision in this case, the steamboat was going on with unabated speed, with the certainty of meeting the coming sailing vessel in the most dangerous part of the strait. I cannot but regard the steamboat as in fault, in not waiting to see which channel the schooner would take.

Was the schooner, also, in fault? Did she keep her course, or did she embarrass the steamboat? In one sense, the schooner kept her course, for she intended, all the time, to go down the east channel, and she took the necessary and proper steps to do so, and she turned into the east channel. But she saw, all the time, that the steamboat, if continuing to move forward, had but one channel to go in, to round Hallett's Point. If the steamboat continued to advance, she must swing around to her own starboard. With the wind north northwest, and the channel from Negro Point to Hallett's Point running about east southeast and north northwest, and the tide as it was, the schooner, before she starboarded and let her sheet run off, must have been going substantially with the tide, without much aid from the wind; and, if not shaking, was hauled very close to the wind; and it ought to have been seen by the schooner, that, if the steamboat should come on, and the schooner should starboard to go down the east channel, the courses of the two vessels would be likely to cross each other, and in such proximity as to involve danger of collision. As it was apparent, therefore, that the steamboat was not in the main ship channel, or in the middle channel, and as the schooner could equally well have gone down either one of those two channels, I think the schooner must be held in fault for not holding herself up to the wind, and refraining from starboarding and letting her sheet go, until she had gone by the steamboat. As it was, she, in fact, crossed the

bows of the steamboat, as the steamboat was moving in the only course, and the only channel, which the steamboat could take. This manoeuvre of the schooner contributed to the collision, and for it the schooner must be held in fault.

A decree will be entered dividing the damages between the two vessels.

[NOTE. A subsequent decree awarded costs to libellants. See Case No. 2,750.]