## THE CITY OF SPRINGFIELD.[1]

## THE EDNA B. KING.

## STUDWELL *v.* THE CITY OF SPRINGFIELD and another.

*(District Court, S. D. New York.   January 21, 1886.*

1. COLLISION—VESSELS MEETING IN NARROW CHANNEL—RIGHT OF WAY.
     The rule that a vessel going with the tide through a narrow, dangerous channel has the right of way, and that a boat going in the opposite direction is bound to wait until the descending vessel has come through, cannot be justly applied when the descending boat has other channels available on the right hand side.

2. SAME—HELL GATE—SEVERAL CHANNELS—KEEPING TO THE RIGHT. ·
     Vessels on the ebb-tide, bound down through Hell Gate, where three channels are available, should not take the east-channel, if they have notice that a boat is coming up; and vessels going up on the right, through the east channel, have the right to assume that descending steamers, in the absence of any contrary indication, will keep to their own right, and pass through one of the other two channels, and not attempt the east channel to the left.

3. SAME—BEND IN RIVER—SEVERAL CHANNELS — LONG WHISTLE — INSPECTORS' RULE 5.
     A long whistle, given in accordance with the inspectors' rule 5, "on approaching a bend in the river," is no intimation, where there are three equally available channels around the bend, that the vessel giving it intends to take the channel to her own left, and such a whistle from a vessel, after passing Negro point with the ebb-tide, is not in practice so understood.

4. SAME—CASE STATED—ASCENDING BOAT NOT BOUND TO WAIT.
     The tug K., with a heavy tow, came down the East river with the ebb-tide. Soon after rounding Negro point, and before reaching Hallett's point, she gave one long blast of her whistle, to which the steamer City of S., being then a few hundred yards below Hallett's point, and bound up through the east channel of Hell Gate, replied with one.   The tug rounded the point, and took the east channel, and the steamer being then in the same channel, and abreast of Flood rock, a collision followed between the latter and one of the boats in tow of the tug, for which both the steamer and tug were libeled, caused, as the court found, by the swing of the tide, which sets across the channel at the rate of six miles per hour.   *Held,* that the tug was in fault for taking the east channel, knowing that a steamer, having the right of way, was coming up through it; and especially so, as she was incumbered with a heavy tow; that the City of S. had a right to assume that the tug would take one of the other channels; that she was not bound to wait below Flood rock to see which channel the tug would take, and that the enforcement of such a rule of navigation in that region would tend to multiply collisions rather than to avert them; that the steamer did all she safely could to avoid the collision, after the intention of the tug became known; and that the libel should therefore be sustained as to the tug, and dismissed as to the steamer.

In Admiralty.

· *Carpenter & Mosher,* for libelant.

*Wilcox, Adams & Macklin,* for the Springfield.

*Frank E. Blackwell,* for the King.

BROWN, J.   · This libel was filed by the owner of the canal-boats T. M. Slaight and W. R. Wheeler to recover for the damages sustained by his boats through a collision with the steamer City of Springfield,

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

in Hell Gate, between Flood rock and the Astoria shore, at about half past 4 o'clock in the afternoon of May 4, 1885. The canal-boats formed part of a tow of the steam-tug Edna B. King, bound westward, with the ebb-tide.

The steamer City of Springfield was upon her usual trip eastward, bound from New York to Hartford. The King was a small tug, having only a 16-inch cylinder, coming from the Sound, with a scow in tow on her port side. At Flushing bay she found the tug-boat Pioneer, with her shaft broken, and drifting with the libelant's canal-boats along-side. The King thereupon undertook to tow these additional boats to New York; and all three were accordingly lashed along her starboard side. Shortly after rounding Negro point, which is about 500 yards to the eastward of Hallett's point, the King gave one long blast of her whistle, as required by the inspectors' rule 5, when approaching a bend in the river. The City of Springfield, being then a few hundred yards below Hallett's point, heard this long whistle, and, shortly after, gave one long blast, which was heard by the pilot of the King. The steamer had come up on the easterly side of Blackwell's island, and had passed near the shore at the Astoria ferry. Ahead of her was a transport with a railway float, which compelled the steamer to go under a slow bell, keeping from 300 to 500 feet astern of the float. To the eastward of Hallett's point there are buildings which, for the most part, obstruct the view across the land. The pilot of the King, at some distance to the eastward of Hallett's point, however, saw the steamer's smoke-stack across the land shortly after her long blast was given; that is, shortly after passing Negro point. The King, after rounding Negro point, did not keep the middle of the channel, but crossed over to the left towards the Long island shore, and ran along near that shore, before reaching Hallett's point. She endeavored to round close to the point, and to go through the east channel; and when from 100 to 200 yards below the point, the Slaight, which was the starboard boat in the tow, swung against the steamer, doing some damage, for which this suit was brought.

The witnesses agree that the collision was nearly abreast of Flood rock, or a little above; but they differ entirely as to the part of the east channel in which the collision occurred. The steamer's witnesses allege that her port side, at the time of the collision, was only from 25 to 100 feet from Flood rock. Many of the other witnesses state that the port side of the tow was only from 25 to 100 feet distant from the Astoria shore. The whole width of the east channel at this point is about 750 feet. The King and her tow were a little less than 100 feet wide; the steamer was 73 feet beam by 290 feet long.

I have carefully considered the conflicting evidence, and am of opinion that the steamer, at the time of the collision, was to the westward of the central line of the east channel, rather than to the eastward of that line. It would be difficult and dangerous, if not wholly impracticable, for so large a steamer as the City of Springfield, going up

against the ebb, to round Hallett's point by going so near the Astoria shore as the witnesses of the libelant and the King allege. The ebb-tide runs around Hallett's point at the rate of about six knots, and the steamer's bows, on striking that swift current, would be so rapidly carried to the westward as to render her for the time unmanageable. Steamers never pursue that course; but, for the reasons just stated, keep in the middle or westerly half of the east channel, so as to head the tide as they round the point. The pilot of the transport, who was but a few hundred feet ahead, and bound westward for the Harlem river, testifies, moreover, that he went up about the middle of the east channel, and, just before the collision, looking astern through the clear water between the steamer and the tow, saw the light at the head of Blackwell's island in range. This would place the steamer in the westerly half of the channel, in accordance with the statement of her own witnesses, and with the usual custom, as well as with the natural probabilities of the case. The testimony of the King's witnesses as to her being so near Hallett's point is probably based upon their close run to Hallett's point as they rounded the point, about a minute before the collision. Flood rock is about 300 yards to the south-west of Hallett's point, and about 150 yards further down the channel. The tide, at the rate of six knots an hour, on turning the point, sweeps downwards and across directly towards Flood rock, and renders navigation there very dangerous to tugs incumbered with heavy tows, even if there are no ascending vessels in the way.

1. The King must be held in fault for this collision, on two grounds: *First*, for undertaking to go down the east channel on her own left, knowing that a steamer was coming up; and, *second*, because her heavy tow, considering the moderate power of her engines, made the attempt to pass the steamer in that location more than usually dangerous. Had there been no other channel than the east channel available to the tug, she would doubtless have had the right of way down, after having given the long blast of her whistle, because she was going with the tide; and the steamer, going against the tide, would have been bound to wait below until the descending vessel had come through the dangerous passage. *The Galatea*, 92 U. S. 439; *The Marshall*, 12 Fed. Rep. 921. This rule is applied wherever the channel is so dangerous that two vessels ought not to attempt to pass each other in it. That is undoubtedly true of the east channel at Hell Gate. But as the rule is founded upon necessity only, it cannot be justly applied where the descending boat has other channels available to her on her own right. In rivers or narrow straits the general rule of navigation is to keep to the right, in the absence of any special reasons for a different course. Such is the international rule. Holt, Rule Road, 250. See International Rule as to Navigation of the Danube, 5 Desjardins, Droit Com. Mar. 43. From Hallett's point, besides the east channel, which is the course to the right for ascending boats, descending boats have two other channels available, namely, the middle chan-

nel, and the westerly or main ship's channel, both of which were free to the tug in this case. It would be extremely onerous and unjust to ascending vessels to hold that a vessel descending with the tide, and having three channels open to her, could rightly cross over to the left side of the stream, and occupy the channel appropriate to ascending vessels, and compel them to wait below until she had passed. This point was directly adjudicated in this court in the case of *The City of Hartford*, 7 Ben. 350, 354. There the schooner coming down through Hell Gate with the ebb-tide, under circumstances quite similar to the present, unnecessarily took the east channel, collided with the steamer while she was upon the turn above Flood rock, and after she had changed her course in rounding about four points. BLATCHFORD, J., in that case, says:

"With the wind north-north-west, and the channel from Negro point to Hallett's point running about east-south-east and north-north-west, and the tide as it was, the schooner, before she starboarded and let her sheet run off, must have been going substantially with the tide, without much aid from the wind, and, if not shaking, was hauled very close to the wind; and it ought to have been seen by the schooner that if the steam-boat should come on, and the schooner should starboard to go down the east channel, the courses of the two vessels would be likely to cross each other, and in such proximity as to involve danger of collision. As it was apparent, therefore, that the steam-boat was not in the main ship-channel or in the middle channel, and as the schooner could equally well have gone down either one of those two channels, I think the schooner must be held in fault for not holding herself up to the wind, and refraining from starboarding and letting her sheet go, until she had gone by the steam-boat. As it was, she, in fact, crossed the bows of the steam-boat as the steam-boat was moving, in the only course and the only channel which the steam-boat could take. This maneuver of the schooner contributed to the collision, and for it the schooner must be held in fault."

The steamer in that case was also held in fault, because she went on "with unabated speed," and did not stop as she might have done, and allow the schooner to pass.

In the present case, the tug had ample notice that the steamer was coming up the east channel. The long whistle that the tug gave was no indication that she intended to take the east channel. The steamer could not assume that the tug was intending to take the east channel, without sufficient notice to her, when the other two channels were equally available. The weight of evidence also is that the more usual practice for tugs with any considerable tows, upon the ebb-tide, is to take the main ship-channel or the middle channel; and all the witnesses agree that it is dangerous for vessels to attempt to pass each other in the east channel between Flood rock and the Astoria shore, on the ebb-tide. The fact, also, that the tug's tow was very cumbersome made her fault in taking the east channel the more gross.

2. As I find upon the facts that the City of Springfield was in the westerly half of the east channel, where she had a right to be, and where it is customary for such vessels to go, the only questions as regards her are (1) whether she was bound to wait below Flood rock,

v.26F,no.3—11

in order to see whether the tug coming down would take the east channel; and (2) if not bound to wait, whether, after perceiving that the tug was coming down the east channel, the steamer did all that was obligatory upon her to avoid the collision. Upon the facts in the case I think that, as respects the last point, no fault can be attributed to the steamer. There was no notice by whistles or otherwise that the tug was intending to come down the east channel until she had actually reached Hallett's point, where she gave two whistles. Even at that time it was in her power to go across by way of the middle channel; by her two whistles and almost immediate turn she indicated her intention to come down the east channel. At that time the steamer was already abreast of Flood rock. The steamer was previously going as slow as practicable, and at once stopped. She also reversed her engines. At the time of the collision she was not moving ahead by land, but only holding her own against the tide. Considering the swiftness of the tide, and its strong set towards Flood rock, the steamer, in my judgment, did all that was safe for her to do, under the circumstances, to avoid collision. Had she backed in the water, she would have run the danger of a far more disastrous stranding upon Flood rock.

As I have already said, there is no general rule of navigation which would require the steamer, coming up against the tide through this dangerous channel, to stop and wait below until a vessel coming down with the tide, and under circumstances like the present, has passed. Other channels being available to the descending vessel, the vessel going up, and in the channel on her own right hand, has the right to assume that the other vessel will keep to her right, and take one of the other channels. But if the vessel bound up has notice or can perceive that the descending boat is actually coming through the channel that belongs to the former, the ascending steamer, though she really has the right of way, is bound to yield that right, and to wait, in order to avoid the obvious risk of collision. *The Colombia,* 25 Fed. Rep. 844, and cases cited. So, here, vessels going up through the east channel on the ebb-tide have the right to assume, in the absence of any indication to the contrary, that descending steamers will keep to the right, and pass through one of the other two channels, and not attempt the east channel—*First,* because the east channel is the right-hand channel for ascending boats, and by custom belongs to them; *secondly,* because, by the universal rule of the road in such cases, a steamer coming in the opposite direction should also keep to the right. A steamer going east, in the absence of any indication to the contrary, has a right, therefore, to assume that vessels coming down will not attempt to take the east channel while there is a boat going up, and has a right, therefore, to proceed on her way without stopping.

I am persuaded, moreover, that the contrary rule would greatly increase the dangers of navigation through this narrow and rapid chan-

nel. If steamers going east were bound to wait below from the moment they heard one long whistle from a steamer after rounding Negro point, this would practically be an invitation to steamers coming down to take the east channel; and this would soon ripen into a customary right to this course. Vessels often come down with the ebb-tide in rapid succession. If the steamer below must wait for one to pass, she must wait for all. While thus waiting, and in the busy traffic that is often found there, ascending vessels would at times accumulate below, among and between which all the vessels coming down with the rapid tide through the east channel would be obliged to thread their way; and in the swift and crossing tide, and with comparatively small headway through the water, the exact course of the descending vessels could not be accurately foreseen. No rule of navigation, it seems to me, could be more onerous upon ascending steamers, or more dangerous in its probable results to all concerned, than such a one.

In this case no signal except the one long whistle was given by the tug until the steamer had already reached Flood rock, where she could not safely back. The long whistle was no indication that the tug would take the east channel, because there were two other channels available to her, on her own right hand around the bend. In practice such a whistle is not understood as any indication of an intent to take the east channel. The tug, knowing that a steamer was coming up, was bound to take one of the other channels. Under such circumstances I cannot hold the steamer bound to have waited below, merely to see whether the tug would violate her obligation to take one of the other two channels. Before the reef off Hallett's point was blasted away some years since, the custom was well settled that tugs with tows, coming down with the tide, must take one of the other channels. Since this reef was blasted off, and the channel round Hallett's point widened by several hundred feet, the evidence seems to show that a practice has sprung up, to some extent, for tugs to take the east channel, keeping on the east side, out of the way of ascending steamers. It is manifest that there is more or less danger always attending these maneuvers; and even if they pass safely round Hallett's point, they are obliged, a little below, to cross the bows of steamers that are frequently coming up on the easterly side of Blackwell's island. The saving of time by taking the east channel is at most not over two or three minutes. There is no reasonable excuse for descending tugs thus to incur a risk of collision whenever vessels coming up are in sight before rounding Hallett's point. Such navigation must be held to be at the peril of the vessels that choose it; and no encouragement should be afforded it by holding that steamers going up should anticipate any such navigation on the part of descending steamers, or should invite it, by waiting for it, except upon a clear agreement by mutually assenting signals. It is to be hoped that the recent blasting of Flood rock and the adjacent reefs will

prove effectual in removing the obstructions that have so long made that passage dangerous.

The libel is dismissed, with costs, as respects the City of Springfield; and the libelant is entitled to a decree against the Edna B. King, with costs.