### THE R. H. WATERMAN and THE TRANSFER NO. 8.

### PHILADELPHIA & R. R. CO. v. THE R. H. WATERMAN and THE TRANSFER NO. 8.

### THAMES TOWBOAT CO. v. THE TRANSFER NO. 8.

(District Court, S. D. New York. July 21, 1897.)

COLLISION—HORN'S HOOK—ROUNDING BEND—CROSSING LINES OF TRAFFIC—SIGNALS NOT ANSWERED—NAVIGATION OBSCURED—CO-OPERATION BY PRIVILEGED VESSEL.

At Horn's Hook the channel of the East river diverges five points to the left up the Harlem river, and one-half point to the right to Hell Gate. Busy lines of traffic there cross each other, and the high ground of Horn's Hook prevents vessels that come down the Harlem river near the shore, and cross the course of those coming up, from being seen, on the flood tide, in time for safe maneuvers to avoid collision. *Held* that, whether inspect-

ors' rule 5 is strictly applicable to the case or not, the prevailing practice
and reasonable prudence require that signals be given under such circum-
stances, indicating the presence of vessels, before they come in sight of
each other; that any signals given should be noticed and properly answered;
that No. 8, in this case, coming down the Harlem river heavily incumbered,
was in fault for unnecessarily keeping close to the shore, and unduly hiding
her approach, and also for undertaking the hazardous experiment of cross-
ing the river and stopping between two tows, requiring the one to pass
ahead of her, and the other astern, without a common understanding by
signals from both; that the W. was also in fault for not observing No.
8's signals, nor co-operating with her, as she might easily have done, to
avoid the collision, when the situation of No. 8 became desperate.

J. Armstrong and Pierre M. Brown, for the Maine.
Carpenter & Park, for the R. H. Waterman.
Henry W. Taft, for the Transfer No. 8.

BROWN, District Judge.   The above libels grow out of a collision
which occurred at about half past 7 a. m. December 7, 1896, near the
mouth of the Harlem river, off Horn's Hook at Eighty-Ninth street,
by which the libelant's barge Maine was damaged so that she after-
wards sank.   The Maine was the starboard boat of four barges that
were going up the East river in a strong flood tide abreast of each other,
in tow of the tug Waterman, on a hawser about 30 fathoms long.
The tide at Horn's Hook was running probably from three to four
knots, and the speed of the boats was about four knots more.   They
went up in about mid channel on the westerly side of Blackwell's Is-
land, and when off Eighty-Fourth street, Transfer No. 8 was seen
emerging from behind the point at Horn's Hook, heading in a south-
erly direction diagonally across the river, on a line about parallel
with a line drawn from Horn's Hook to Blackwell's Island light, and
about 200 feet above that line.   Transfer No. 8 had two car floats in
tow, one on each side of her 247 feet long and each loaded with cars.
She had come down the Harlem river and had rounded to port across
the stream, in order to go to the easterly side of Blackwell's Island,
where the flood tide was not so strong as on the westerly side.   A
little to the starboard of the tug Waterman and her tow was the tug
Genista, coming up with a schooner in tow on a hawser about 30
fathoms long, and overtaking the Waterman.

When No. 8 first became visible, the tug Genista was probably be-
tween the Waterman and her tow, and about 30 feet to starboard of
the tow.   She was gaining rapidly upon the Waterman, and as soon
as No. 8 became visible, she gave her a signal of one blast, indicating
that she would go ahead of No. 8.   The pilot of No. 8 claims that he
had just previously given a signal of two whistles, designed for the
Waterman; that when the Genista's signal was heard he was giving
signals to his engineer to slow and stop, because he knew that the
Genista must go ahead of him; that the Genista very soon afterwards
gave a second signal of one whistle, when a little ahead of the Water-
man, which was heard by No. 8 and was immediately answered by the
latter with one whistle; that No. 8 soon after gave two whistles to the
Waterman; and that by these signals it was intended to bring No.
8 to a stop, and that the Genista with her tow should pass in front of

No. 8, while the Waterman with her tow should go astern of her. No. 8 came to a stop when a little more than half way across the channel towards Blackwell's Island; the Genista and her tow passed ahead and within 25 feet of her; but the Waterman's tow not being far enough to the westward to clear, the stem of the barge Maine struck the starboard side of No. 8's starboard float about 18 feet from her stern, and was so much injured that she afterwards sank, with an alleged damage of $3,000 to the barge, and about $2,500 to her cargo, for which the first above libel was filed.

The second libel was for expenses and damages alleged to have been sustained by the Waterman in injury to her propeller while endeavoring to save the Maine, as well as for the repair of damages to the other barges, and the loss of their use while being repaired.

I am of the opinion that this collision took place, primarily, from the lack of precautions on both sides that were reasonably necessary and incumbent upon each in order to avoid destructive collisions off Horn's Hook. In going past Blackwell's Island by the westerly channel, the Harlem river diverges five points to port around that point. The direct channel to the Sound, through Hell Gate, diverges about half a point to starboard. There is a large and constant traffic up and down the Harlem river around the Hook, and a still larger traffic past the Hook to the eastward, so that these lines of traffic cross each other, when boats on the flood tide go down as usual to the eastward of Blackwell's Island. The channel between Horn's Hook off Eighty-Ninth street and Mill Rock to the eastward, forming the mouth of the Harlem river, is less than 1,200 feet wide; and between Mill Rock and the flats off Ninety-Third street, there is only about 600 feet of available breadth of water. Vessels coming down the Harlem river in the middle of the channel, heading properly as did No. 8, for the line of Avenue B., cannot be seen by vessels coming up in mid channel below the Hook, until they are so near to each other that on a strong flood tide there is not reasonable and sufficient time and space for the observation and maneuvers necessary to avoid collision with any certainty, if signals are not exchanged before the vessels themselves are seen. When these vessels were first visible to each other, the Waterman was less than 1,300 feet from the point of collision, and Transfer No. 8, probably about half that distance. The collision happened therefore in about a minute and a half after No. 8 was first seen. It is manifest that this does not afford reasonable time or space for avoiding collision by tugs heavily incumbered with tows like those in this case; and the necessity of signals to give warning of the approach of vessels before they are seen rounding the Hook in either direction, and the necessity of a reply to such signals, seem to me clear.

Inspector's Rule 5 requires steamers approaching a bend in the channel where the view is obstructed, to give a long blast of the whistle, when within a half mile of it. The witnesses for No. 8 testify that this long blast was given by her somewhere between Ninety-Second and Ninety-Sixth streets. This blast, if given, was not heard by the Waterman, and no similar signal was given by her. In the Waterman's behalf it is contended, that the inspector's rule is not applicable, for the reason that there was no bend in the channel which the

Waterman was following that was obscured; since she was designing to go through Hell Gate to the right.

I think the inspector's rule does not literally embrace the Waterman's case, but does embrace vessels which like No. 8 are designing to round a bend in the channel way which they are pursuing. The weight of testimony, however, is to the effect that the use of such a signal is certainly customary with the larger vessels going up the East river on the flood tide and is practised by many tugs also; and the reasons for the inspector's rule are almost equally applicable to vessels going on either side of the Hook. The witnesses for the Waterman deny that there is any definite custom to give such a signal, though admitting it is often done. If such signals are omitted by vessels ascending with the flood tide, the situation of vessels coming out of the Harlem river becomes specially difficult and dangerous. For the duty of "keeping out of the way" is cast by law upon them, both because they have the other vessels on the starboard hand, and because the latter are going with the tide, and the former against it. I have no doubt, therefore, that the practice referred to originated in the recognized necessity for it; and that it is the duty of ascending vessels, if not to give such a signal independently, at least to keep a careful lookout for any such signals from vessels in the Harlem river that may be coming down unseen, and to answer them when heard. The pilot of the Genista says that before he saw No. 8 he was not attending to vessels in the Harlem river or to their signals; and the pilot of the Waterman says he was waiting on the signals between the Genista and No. 8. I must find therefore that No. 8 did give the long signal which several of her witnesses so positively testify to, though it was not noticed by the tugs; and that had this signal been noticed and answered by the Waterman, No. 8 would have checked her speed in time to allow the Waterman and her tow to pass ahead of her, as did the Genista and her tow. At the time the vessels were seen, I am not able to find, contrary to No. 8's testimony, that by reversing at once she would have been stopped in time to let the Waterman and her tow pass ahead of her; on the other hand it is evident that the Waterman might easily have gone to port under a starboard wheel, and have hauled her tow under No. 8's stern after she saw that No. 8 was coming ahead of her.

The case of The Volunteer and The Syracuse, 49 Fed. 477, cited in behalf of the Waterman, though in many respects similar to the present, differs in the following respects: (a) That there the vessels had exchanged signals of two blasts, each given in sufficient time; (b) that the Syracuse, which was going up, hauled far in towards the New York shore, so that at collision she was only 200 feet or less distant from it; and (c) the Volunteer was not embarrassed by the presence of other vessels. It was accordingly there held that the collision was wholly the fault of the Volunteer, which was coming down, in getting too near Horn's Hook and not keeping off sufficiently to port, as she might have done, to give the necessary room for the Syracuse to pass astern of her. In the present case there was no common understanding, through an exchange of assenting signals; the Waterman did not sensibly haul her tow to port as she might have done, and she did

not try to do so until within 200 or 300 feet of No. 8's float, which was too late to be of any use. The Waterman was going much faster than No. 8; and at a much greater distance than 200 to 300 feet it must have been perfectly manifest to her that No. 8 could not stop in time to permit the Waterman and her tow to pass ahead of No. 8; while the fact that the Genista and her tow were to cross the bow of No. 8 would certainly prevent No. 8 from going ahead enough to clear the tow of the Waterman, unless the tow was hauled to port. There was nothing in the Waterman's way to prevent this. She delayed making any attempt to do it until it had little effect on the tow before collision, and was of no use. This was a neglect of the most ordinary caution, irrespective of any question of whistles; and on this ground also I must find the Waterman to blame.

As bearing on the latter fault, I observe that the probabilities of the case agree with the testimony on the part of No. 8, that before the Genista's first whistle was given, No. 8 gave a signal of two whistles to the Waterman. The fact that No. 8 did not reverse at once when the Waterman was seen, but immediately stopped her engines and did not back with a jingle until a few seconds afterwards, makes it evident that she expected, as her pilot testifies, to go ahead of the Waterman and between the two tows; and with that intention, it is scarcely credible that the pilot should omit the usual signal of two whistles. When after this the Genista gave two signals of one blast each, and No. 8 answered her with one blast, the position of No. 8 was such, with her long and heavy tow crossing the river, as not possibly to permit the Waterman reasonably to suppose that that signal was designed for the Waterman also; or that No. 8 could keep out of the way of the Waterman and her tow by reversing and so going astern of the Waterman's tow. It was the plain duty of the Waterman, therefore, to starboard much earlier than she did; and a little starboarding would have avoided this collision. The Waterman was also in fault in delaying her signals. She gave none, until they were of no use.

Transfer No. 8, is, I think, also to blame in two respects. (1) In keeping so long near to the New York shore (within 200 feet) when rounding to cross the river under Horn's Hook; and (2) in undertaking the dangerous maneuver of stopping between the two other tows, with her own long and heavy tow.

Her own evidence shows that she went within about 200 feet of the Hook, to the northeast of it, on a course already taken obliquely about 6 points across the river, and 2 points down. Her reason for keeping so long near to the New York shore, while starboarding, was no doubt to keep in the weaker tide. But this is not sufficient justification for keeping far to the right of the middle of the channel between Horn's Hook and Little Mill Rock, when this course would so much longer obscure her from sight below the Hook. There was nearly 1,200 feet of available water there. She rounded within the westerly quarter of it, close in under the Hook; and this was no doubt one of the immediate causes of the collision, because it unnecessarily delayed the sight of the vessels to each other, and gave considerably less time and space for necessary maneuvers. The fact also that No. 8 got no an-

swer to her long whistle, was not a complete justification for the assumption that no vessels were approaching from below the Hook; since often such signals are not noticed or not answered.   She had no right to increase the natural hazards by keeping a course close to the shore, hidden longer than was necessary behind the Hook and diminishing her own means of performing her duty to keep out of the way. She could have kept near the middle of the channel without the least danger of being carried by the flood tide on Little Mill Rock.   In this close approach to Horn's Hook the case is similar to that of the Volunteer and her fault is the same.

(2) To undertake to avoid collision by coming to a stop in crossing so strong a tide, with a heavy tow 247 feet long between two other tows that were near together and which she must separate, so that the Genista and her tow should go ahead of her, and the Waterman with her tow go astern of her, was a hazardous experiment.   It required not only very careful handling and judgment on her own part, which no doubt were here given, but it also required co-operation upon the part of both the other tugs having tows.   As it was the duty of No. 8 to keep out of the way of both of the other tugs and their tows by her own maneuvers, she had no right to undertake a delicate and hazardous maneuver requiring co-operation by the Waterman, except on a previous common understanding by signals in time to make it effective and free from danger, unless the situation was already in extremis, and no safer alternative was apparent.   Here there was co-operation on the part of the Genista, but not on the part of the Waterman; nor was there any common understanding by signals with the latter; and No. 8 did have the alternative of keeping more to port, which, though inconvenient to herself, she might have adopted, as it seems to me, without imperilling either herself or the Genista's tow. But if not and if she was in extremis from the time the tows were seen, it was partly by her previous fault in getting into that situation.   The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468.

I have, indeed, found that the Waterman might and ought to have co-operated to avoid collision, as soon as it was evident that No. 8 was crossing her bow and could not avoid her without her help, and I have held her in fault for not doing so; but as the primary duty was on No. 8 to keep out of the way, she must be held in fault both for unnecessarily prolonging the obscuration of the vessels to each other by keeping so near the shore and for unnecessarily undertaking a hazardous maneuver that she could not successfully accomplish alone, nor without a previous agreement by signals for co-operation on the Waterman's part, which was not obtained.

The damages must, therefore, be divided between the two tugs.