## THE ZOUAVE.

(District Court, E. D. New York. May 11, 1898.)

1. COLLISION—STEAMERS CROSSING—DUTY TO KEEP AWAY.
   When steamers are approaching on intersecting lines, the one having the other on her starboard hand must keep out of the way; and, if she attempts to cross her bow, the privileged vessel will not be held in fault for not stopping, unless danger is apparent, especially when to do so would permit the strong tide to set the vessel in the direction in which the crossing vessel was proceeding.

2. SAME—TUG AND TOWS—USE OF BRIDLE.
   The system of towing by means of a bridle is neither uncommon nor in itself unsafe, and where the bridle breaks on a sudden strain, caused by the tug's starboarding to avoid an approaching vessel, the tug will not be held in fault, in the absence of proof that the bridle was too small, or out of repair, or otherwise insufficient.

3. SAME—TUGS WITH TOWS.
   A tug going up the East river and approaching Hell Gate by the eastern channel, held not in fault for crossing the bow of another tug coming down the river against a strong tide, and which was hugging the eastern shore, to hold her tows against the tendency of the tide to set them towards the western shore, it being apparent that, if the former tug went to starboard, she would interfere with this maneuver, of the other, and create danger of collision.

4. SAME—STEAMERS APPROACHING BEND—HELL GATE—SIGNALS.
   Tugs approaching Brown's Point, near Hell Gate, are subject to inspector's rule 5, which requires a steamer "nearing the short bend or curve in the channel, where, from the height of the banks or other cause, a steamer approaching from the opposite direction cannot be seen for a distance of half a mile," to give one long blast of the whistle, and a failure to do so places them in fault when collision results from failure to see each other in time.

5. SAME.
   Inspector's rule 5, requiring the pilot of a steamer approaching a sharp bend, etc., to give a long blast of the whistle "when he shall have arrived within a half a mile of such curve or bend," does not require the signal to be given immediately on reaching a point a half a mile distant; and a steamer which, after giving the signal, or reaching a point where it should be given, stops at a wharf, or is otherwise detained, is not relieved from the duty of giving it when she resumes her approach to the bend.

6. SAME.
   Failure to give the signals required by inspector's rule 5 where a steamer is approaching a bend places the burden on the delinquent steamer of showing that such failure did not contribute to the collision, and in the absence of such showing, she will be held in fault, though it be not affirmatively shown that the omission did contribute to the collision.

This was a libel in rem by Charles J. Tice, owner of the barge Ada No. 6, against the steamtugs Zouave and Sea King and the barges Chalmette and J. F. Merry to recover damages resulting from a collision in the East river at Hell Gate.

The following is a copy of the map referred to in the opinion:

Carpenter & Park, for libelant.
Stewart & Macklin, for the Zouave.
Benedict & Benedict, for the Sea King.
Black & Kneeland, for the Chalmette and the J. F. Merry.

THOMAS, District Judge. On the 28th day of October, 1894, at about 7 o'clock in the evening, the steam tug Zouave was going up the East river with a strong flood tide. She had in tow three barges on her port side, two loaded with sand and one with coal, and two barges on her starboard side, loaded with coal; the barge Ada No. 6, belonging to the libelant, being on the starboard side. The steam

tug Sea King was coming down the river, towing, by a hawser about 120 feet in length, two empty barges; the J. F. Merry being on the starboard side, and the Chalmette being on the port side. The hawser ran directly from the tug to the Chalmette, with a bridle extending from the tug to the Merry, whose bow was about eight feet astern of the bow of the Chalmette. The tide was running swiftly around Hallett's Point, and in consequence thereof, and the burden of her tow, the Sea King, after struggling for an hour to pass the point, finally reached a position about midway between such point and the Astoria ferry. This point is designated on the map as 43, in a circle. Her position in the channel was about 250 or 300 feet from the Astoria shore, and about 1,000 feet from the Astoria ferry. While in about this position, she received two signals from the Zouave, indicating the intention of that tug to go to port, and to pass the Sea King on the starboard side. Then the Sea King for the first time saw the Zouave, and immediately answered the latter's signals. The signals of the Zouave were given when she first saw, or could have seen, the Sea King, and the latter tug could not have seen the Zouave at a greater distance. After the interchange of signals as above stated, the Sea King put her helm hard a-starboard. The helms of the barges were in that position, and were so continued. The Zouave also starboarded. The tugs passed each other, their starboard sides being about 50 to 65 feet apart; but, it thereupon appearing to those in charge of the Zouave that there was danger of her colliding with the Sea King's tow, the Zouave gave a danger whistle, and thereupon both vessels stopped as soon as possible. It appears that when the Sea King went to port in obedience to the signals, the bridle running to the barge Merry broke, which caused the tow, instead of following the lead of the tug eastwardly, to continue somewhat southwesterly, under the influence of the tide which set northwestwardly. This tended to bring the Sea King's tow nearer to the Zouave and her tow, and before the Sea King could get sufficiently to the eastward to draw her tow safely away from the Zouave, the bows of the Merry and Chalmette struck the Ada No. 6 on her fore quarter, causing the injury for which the libel is filed. The collision occurred at the point on the map marked 93, in a circle.

The question of the liability of the tug Sea King may be considered first in order. The Sea King contends that her course, when she heard the whistles of and sighted the Zouave, was about southwest, with Blackwell's Island lights about one point off her port bow. Such course is marked on the map appended to the opinion, "Course claimed by Sea King." If now it be accepted that the Zouave, as her captain claims, was at this time at the point on the map marked 59, in a circle, it is apparent that the Zouave must have seen first the Sea King's red light. In such position she would show only her green light to the Sea King. Now, let it be assumed, that the Zouave at this juncture gave two whistles, indicating her intention to pass the Sea King starboard to starboard. Without discussing at this time the propriety of this signal, was the Sea King at fault in accepting it? The Sea King immediately starboarded and pointed towards the Astoria shore, changing her course several points, and as much

as was practicable. Such starboarding brought the Sea King into the second position claimed by her, when her red light would be shut in, and her green light would be disclosed to the Zouave as the result of obedience to the Zouave's signal. It is not apparent that the Sea King was in fault under such circumstances. But now, if it be contended that the Sea King was not pointed so far to the westward when first discovered by the Zouave, but was headed upon a course appropriate to take her along and parallel to the Astoria shore, marked on the map, "Sea King's parallel course," still the red light of the Sea King would first appear to the Zouave, and still the Zouave would show only her green light to the Sea King. If, thereupon, the Sea King starboarded, and turned to the eastward, directly towards the Astoria shore, which is her second position, as claimed by herself, and as conceded by the Zouave, still the Sea King had done everything that was required of her in obedience to the Zouave's signal. But the Zouave claims that at the time of sighting the Sea King the green light of the Sea King was first seen, and only that light was disclosed at any time. Such a condition would show a course on the part of the Sea King which, if pursued, would carry her upon the Astoria shore, and the evidence of the captain of the Zouave shows that after the signals the Sea King was not only headed for the Astoria shore, but that she was very close to the same. The evidence also shows that after the signals the Sea King starboarded. But whether the Sea King did thereafter starboard, she was in any case pointed for the Astoria shore. If the Sea King was pointed to the Astoria shore, and the Zouave signaled to go to port, it would seem that she could do nothing more to effect a safe passage; and if it be considered that the Sea King starboarded, and pointed still more to the Astoria shore, no other duty was required of her to commend her to credit. It must be remembered that the Sea King was but 200 or 300 feet to the westward of the Astoria shore, and if, after the signals were given, she was heading in the direction claimed by the captain of the Zouave, or changed her course still more to the eastward, she could have done nothing more. Hence it must be held that in maneuvering the Sea King was innocent of wrong.

But it is said that when the Sea King heard the Zouave's signal, and considered that the Zouave was running across her course, she should have stopped, and have given the alarm signals. This proposition, logically stated, is this: (1) The Zouave was running across the Sea King's bows, with a strong tide sweeping to the westward. (2) The Zouave undertook to cross the bows of the Sea King, which she saw on her starboard hand. (3) The Sea King should, in the darkness, have been so keenly alive to the possible danger of such an attempt that she should have arrested it by danger signals, as she was not permitted to cross the signals of the Zouave. This would place the burden of the situation upon the Sea King, while the law places the burden on the Zouave. The E. A. Packer, 140 U. S. 366, 11 Sup. Ct. 794. Where ships are running on intersecting lines, the one which has the other on her starboard side must keep out of the way of the other. The Cayuga, 14 Wall. 270; The Corsica, 9 Wall. 630; The Columbia, 10 Wall. 246. Moreover, it is not apparent from

the evidence that the Sea King's captain foresaw with sufficient clearness the danger of the Zouave's maneuver to enable the court to say that the Sea King should have assumed to decide that the passage could not be effected according to the Zouave's manifest design. The tide was sweeping to the opposite shore; the vessels were about 1,800 feet apart; the night was dark, but clear; the Sea King was on a proper course, and immediately made every effort to withdraw herself and her tow to the eastward. It cannot be said fairly that at the time due skill and care required the Sea King's captain to stop, and risk the consequences of the tide setting her across the channel, and, maybe, into collision with the Zouave, who would be carried by the tide in the same direction. What would have happened under such circumstances is entirely problematical. But it is beyond doubt that, had the Sea King pursued this course, it would have been energetically claimed in this court that the Sea King should have turned, promptly and vigorously, her bow to the Astoria shore, and have used every effort to clear her tow from the course of the Zouave.

It is further alleged that the Sea King was not attached to the tow by a proper hawser, that the bridle running to the Merry was an unsafe device, and that a separate hawser should have been used for each boat. The hawser was of sufficient strength; it did not break; and, if the bridle was as strong as due care required, no fault can be urged, as the system of thus conveying a tow is neither uncommon nor in itself unsafe. There is no evidence that the bridle was too small, or out of repair, or otherwise insufficient. The sudden strain upon the hawser caused by the Sea King's starboarding, resulted in the lines parting. As a consequence, the tow either did not follow the Sea King with promptness, or sheered to the westward, or kept along on a southwesterly course. The conclusion is inevitable, upon a careful survey of the case, that this parting of the bridle was a contributing cause of the accident; and if it appeared that there had been a lack of care in the selection of the rope for the bridle, such failure would have established the liability of the Sea King. No such evidence is given, and hence it must be found that no such negligence has been established. Indeed, the insufficiency of the rope does not seem to have been made an issue beyond this: that the system of using any bridle was improper.

Another fault charged against the Sea King is that she failed to provide a proper lookout. Regarding this it is enough to say that the tugs sighted each other as soon as the bend in the Astoria shore, the ferry rack, and the ferryboat therein, would permit. If it was a negligent omission to employ the captain and mate at the wheel, and to act also as lookout, yet the omission did not contribute to the accident, and only those negligent acts or omissions which are efficient causes of an injury can establish liability.

There is but one other question of fault respecting the Sea King, and the same culpability is alleged against the Zouave, viz. that they did not give a proper warning signal when approaching the bend. Before considering this, however, the question of the Zouave's liability from other acts or omissions charged may be discussed. If the Sea King was in the position claimed by the Zouave, the Zouave saw her

green light. If the course of the Sea King was such as the Sea King claims, or was parallel with the Astoria shore, the Zouave saw the Sea King's red light at the outstart. If now it be concluded that the Zouave first saw the Sea King's green light, the Zouave was privileged to go to port, and pass starboard to starboard, as then the position would be green to green. But what shall be said if the Zouave saw the port light of the Sea King? Then the position would be, the Zouave's green light to the Sea King's red light. In such case the Zouave knew that she was crossing the Sea King's bow. She might either go to starboard, so that the tugs would pass port to port, or the Zouave might proceed across the Sea King's bow, if the time, distance, and circumstance justified. Respecting this the supreme court, in The E. A. Packer, 140 U. S. 366, 11 Sup. Ct. 796, has said:

"While this duty of avoidance is ordinarily performed by porting and passing under the stern of the other vessel, and while this is evidently, under ordinary circumstances, the safer and more prudent course, cases not infrequently occur were good seamanship sanctions, if it does not require, that the maneuver shall be executed by starboarding, and crossing the bows of the approaching vessel. Of course, in doing this the steamer takes the risk that the approaching vessel, while fulfilling her own obligation of keeping her own course, may reach to the point of intersection before she has passed it herself. And hence at night, or in thick weather, the maneuver will be likely to be attended with great danger."

It thus appears that the obligation of the Zouave to port may be modified by circumstances. The tide swept strongly to the New York shore. The Sea King was from 200 to 300 feet from the Astoria shore, fighting the tide to get into position to pass properly into the west channel. Would it have been safer for the Zouave to have ported, and attempted to pass between the Sea King and the Astoria shore? This would have resulted in compelling the Sea King to change her course, assuming that it was as claimed by the Zouave, or even as claimed by the Sea King itself, so that she, with her tow, would have been brought fully under the influence of the tide, which she was undoubtedly using every effort to resist. The Sea King was probably bucking the tide, although her general course somewhat tended to the west channel, and it was probable that in so resisting the tide she may have turned her bow temporarily towards the Astoria shore, and thus showed the Zouave her green light. In such case the green light would not properly disclose the Sea King's intended course. Under these conditions the rule was not exacting that the Zouave should go to starboard, and it does not seem that such would have been the safer maneuver. As there would have been little room for the Zouave to pass between the Sea King and the Astoria shore, with the tide carrying her to the westward, it is perfectly apparent that, whatever light the Sea King disclosed to her, great danger threatened such a maneuver. Therefore the court is unwilling to determine that under the exigencies of the situation, the Zouave was negligent in failing to adopt the starboard course.

It remains to be considered whether the tugs duly gave the long blast of the whistle before approaching the bend at the ferry, known as "Brown's Point," and, if not, whether such an omission was negli-

gence. The Sea King concedes that she did not give the warning, but the Zouave claims that she did give the signal at Lunatic Rock. The captain of the Zouave, and her pilot, testify to this. The captain testified that the whistle was a long one, "probably a minute or a little more," and that it could be heard a long way off. The witness states that the Zouave was then probably 100 or 200 feet below or southerly of Lunatic Rock. The pilot of the Zouave states that the long whistle was given "right before we got to Lunatic Rock," maybe half a minute away from the same. Three other witnesses were called by the Zouave,—her engineer, and also Norton and Smith,— each of the two last being in charge of boats in the Zouave's tow, and in positions to hear the long whistle had it been given. The engineer of the Zouave, Norton and Smith, state that they heard the signals interchanged by the tugs, but the engineer and Norton testify that they did not hear any other whistle from the Zouave, and Smith does not state whether he heard it. The captain of the Ada No. 6, in the Zouave's tow, was in a position to hear. He did hear the interchange of signals, but did not hear the long whistle. The captain of the Zouave states that the long whistle could be heard a long way off. The signals were interchanged when the tugs were about 1,800 feet apart. The long whistle is claimed to have been given when the tugs were 2,300 or 2,400 feet apart, as the measurements on the chart will show. The captain and mate of the tug and the captains of the Merry and Chalmette plainly heard the whistles interchanged, but none of them heard the long whistle. Under this state of facts, what is the truth? On which side is the preponderance of evidence, considering the relations of the parties to the transaction? The conclusion seems inevitable, when all heard the two whistles, and no one, save the captain and pilot of the Zouave, heard the long whistle, that such signal was not given. The question, then, is, should it have been given? The captain of the Zouave says it was customary for tugs in his position to give it. However, the essential question is, was the omission of the tugs to give the warning signal a violation of the rule? This is purely a question of law, and involves no questions of fact other than those above decided. The rule is as follows:

Rule 5: "Whenever a steamer is nearing a short bend or curve in the channel, where, from the height of the banks or other cause, a steamer approaching from the opposite direction cannot be seen for a distance of half a mile, the pilot of such steamer, when he shall have arrived within half a mile of such curve or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by the pilot of any approaching steamer that may be within hearing. Should such signal be answered by a steamer upon the farther side of such bend, then the usual signals for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such pilot be not answered, he is to consider the channel clear and govern himself accordingly."

The tugs were approaching Hell Gate, which, notwithstanding the removal of Flood Rock, is a place dangerous for navigation, and one that requires a high degree of diligence on the part of a vessel, not only for its own safety, but also for the safety of other vessels that may be making a passage through the Gate. The bend at Brown's Point is sharp, and curves several points eastwardly. The distance

between Hallett's Point and Brown's Point is about 1,900 feet, and the lights of a vessel passing between such two points might not be seen by a vessel coming up the east channel, until the point had been nearly reached. Hence, whatever should be done to effect a safe passing of boats must be done within a limited space. In the same way, a vessel approaching Brown's Point from the south, through the east channel, might not be seen by a vessel beyond such point until the former vessel was nearly at the point. In the present case the tugs were only about 1,800 feet apart when they sighted and signaled each other; and, while the vessels might be so situated that this interval would be increased, yet their localities might be such that the intervening space would be much diminished. The tide sets strongly through the Gate, and burdened vessels are greatly affected in their speed and course by its influence. This Gate, whose perils are well recognized, is a common pathway for ships of all descriptions, both during the day and night, and the tugs in question were about to pass through it in utter disregard of the rule above quoted. They were nearing a short bend or curve. From the height of the banks or other cause, in this case the intervening land and the ferry house and racks, a steamer approaching from the opposite direction could not be seen for a distance of half a mile from either direction. The rule declares in such a case that the pilot, "when he shall have arrived within a half a mile of such curve or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by the pilot of any approaching steamer that may be within hearing. Should such signal be so answered, then the usual signals for meeting and passing shall immediately be given"; but, if the first alarm signal of such pilot be not answered, he is to consider the channel clear, and govern himself accordingly. Neither tug complied with this rule, so emphatically applicable. Had the Zouave complied with it, there is a strong presumption that the Sea King would have heard the signal; and an observance by the Sea King of the rule might have conveyed notice of her approach to the Zouave.

In behalf of the Sea King it is claimed that an observance of this rule would have been powerless to prevent the accident. It is contended that the Sea King would have been to the eastward of Hallett's Point when the signal was required, and, as the Sea King was detained at Hallett's Point for about an hour in her effort to pass it, the Zouave would have been some miles down the river at the time such signal was due. The argument is this: (1) The warning must be necessarily given a half mile away from the bend for which it is intended, and hence in this case to the eastward of Hallett's Point; (2) the Sea King was detained at Hallett's Point for an hour after the signal was due and should have been given, if at all; (3) hence the Zouave was at least an hour away down the river when the signal should have been given, and could not have heard it. The position seems defensible neither in logic nor in law. The fifth rule does state that the pilot shall give the signal "when he shall have arrived within a half mile," etc. The above argument would construe this to mean that at the furthest point within a half mile from the bend the signal should be given, and that such signal, if so given, would satisfy, once

for all, the obligation of the statute, and all other obligation to give a warning signal. Hence, if the vessel be detained for an hour in one place before coming to the bend, the duty performed an hour before would be all sufficient. It is obvious that the letter and spirit of the statute forbid such interpretation. The statute commands a vessel nearing a bend, and when within a half mile thereof, to give a signal. It is intended that the signal shall be given at some time when the vessel is so nearing the bend that it may be heard by vessels approaching from the opposite side of the bend. It does not command nor intend that the signal may be given just within the half mile, and that the signaling vessel may then lay to, or go to anchor, or go into a dock, or be detained at an impassable point for an hour, and then silently proceed towards the bend, in reliance upon the signal given at a time so far past that it is at the later time useless for the purposes of warning. The statute contemplates an uninterrupted and continuing forward movement of the signaling vessel, and the sounding of the whistle with such reference to this nearing the bend, as may amply warn the approaching vessels, or enable the fact to be known whether there are such vessels, and, if so, allow time for making due arrangements for passing. The very fact of an hour's detention after giving such signal would of itself show that the past signal had become useless, and that another was required. Independently of the statute, the ordinary obligations of good navigation should require vessels to give signals when approaching a bend like that at Brown's Point, and this is illustrated by the situation in which the tugs found themselves in the present instance. Before their lights could be seen and signals given, they were so near to each other that proper arrangements for passing could not be perfected and executed. It is also urged by the Sea King that such warning was not required of her, as she was intending to go down the west channel, and was not intending to round the point and pass down the east channel. It will be noticed that the statute does not apply merely to vessels intending to round the point, but to vessels nearing a point. And as the Sea King was intending to pass the point, or near to it, for the purpose of pursuing her intended course, she was offering approximately the same danger to vessels coming up the east channel as would have been the case had she purposed to round the point. It must therefore be held that both tugs were negligent in not giving this required signal. If it be urged that it cannot be shown satisfactorily that the giving of such warnings would have prevented the collision, it may be replied that the failure to give such signals places the burden upon the offending vessels to establish that such failure did not contribute to the collision. The parties have not discharged this burden.

The above conclusions result from a prolonged and careful examination and study of the case. The liability of the tugs, as found, depends upon the proper solution of the legal question whether warning signals for Brown's Point should have been given. If the finding is erroneous, it is capable of ready correction. A decree should be entered in favor of the libelant, apportioning the damages, when ascertained, equally between the tugs, with costs.