### THE CATAWISSA.

### THE CHEEKTOWAGA.

(Circuit Court of Appeals, Second Circuit. February 10, 1914.)

Nos. 129, 130.

1. ADMIRALTY (§ 115*)—APPEALS—PRESERVATION OF RECORD.

In admiralty suits which are heard de novo on appeal, it is important that charts referred to by witnesses, and on which locations pointed out are marked, should be preserved in the record.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 743–745; Dec. Dig. § 115.*]

2. TOWAGE (§ 11*)—COLLISION BETWEEN TOWS—MUTUAL FAULTS.

A tug, with three barges abreast in tow on two hawsers, was passing westward through Hell Gate, and was near Negro Point, where the port hawser parted, and it became necessary to anchor while straightening out the tow. While so anchored, another tug with tows came around the point from the westward on an ebb tide, and one of her tows came into collision with one of those of the disabled flotilla. Held, on the evidence that both tugs were in fault; the moving one for not being more carefully navigated, and the other for not hearing and answering the bend

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

signal of the first, which in the condition of the tide could not stop after rounding the point.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeals from the District Court of the United States for the Southern District of New York.

These causes come here upon appeals from decrees of the District Court, Southern District, of New York, holding the steam tug Catawissa solely in fault for a collision between the barge Silver Brook in tow of the Catawissa and the barge Marine in tow of the Cheektowaga.

The Cheektowaga with three barges in tow abreast on two hawsers was proceeding from the sound through Hell Gate to the westward. Somewhere in the vicinity of Negro Point Bluff, at about 5:20 a. m., the port hawser parted, whereupon, owing to the fact that all the strain came upon the starboard hawser, the barges sheered to port. In order to check this sheer, the Cheektowaga went ahead on her engines and straightened out the tow, the barge captains co-operating in this maneuver by hard aporting their wheels. This caused the barges to move forward with a sheer to starboard and to prevent them from going ashore the anchors of two of them were let go on about 30 fathoms of chain. The Cheektowaga then dropped back between the starboard barge and the shore, so close to the shore that she touched bottom more than once. Orders were given to the barges to shorten their chains and get under way, but it was found that the anchor of one had fouled the chain of another, which took some time to clear up.

Subsequent to the breaking of the hawser and before the Catawissa rounded Negro Point, the Eureka eastward bound with three loaded barges passed the flotilla apparently without difficulty. Soon afterwards the tug Mabel with three light barges westward bound also passed. The passing of the Mabel is not significant, as she was proceeding against the tide.

At about 6 a. m. the Catawissa came around Negro Point with three loaded barges abreast on a bridle hawser; from the stern of the tug to the bow of the bridle barge was from 190 to 200 feet. At Negro Point, and for a certain distance beyond, there is a set of the tide across to the Long Island shore. To counteract this the Catawissa held her head up towards Ward's Island to keep her tow off Scaly Rocks. The result was that when she straightened up, the port bow of her port barge came into collision with the starboard bow of the Cheektowaga's starboard barge. While the two tows were in collision the Fall River boat Providence passed them on the Long Island side, bound for New York. She passed so close to the nearest barge that "one could almost have stepped aboard."

The above statement of facts is a recital, somewhat condensed, of the findings of the District Judge.

Armstrong & Brown, of New York City (Pierre M. Brown, of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (Howard S. Harrington and T. Catesby Jones, both of New York City, of counsel), for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. Concededly the width of the Cheektowaga and the barges, as they lay at anchor, including their clear-

ances, was 130 feet. The distance of the Cheektowaga from the shore is variously estimated at from 100 to 180 feet. The chart shows that to eastward and to westward of Negro Point Bluff the shore recedes somewhat. The amount of navigable channel left for the Catawissa, which after she had rounded Negro Point on that tide would have to go on, depends on the location of the Cheektowaga's flotilla. Two or three hundred feet to eastward or westward would make the open water greater or less.

We find nothing wrong in the make-up of either tow; no negligence attributable to the Cheektowaga in the parting of the hawser, nor in her maneuvers to break the consequent sheer, nor in anchoring two of her barges, nor in the fouling of anchor and chain.

[1] We are much impressed in this case with the testimony of the principal witnesses as to navigation, they seem to be men of large experience, exceptionally intelligent, thoroughly familiar with the locality, the movements of the water and the chart, and frank and quick in their answers to all questions. The crux of the case is the exact localities where the hawser parted and where the Cheektowaga's flotilla lay as the Catawissa approached. Apparently there is a discrepancy on this point between the witnesses from the flotilla and the navigator of the Eureka, called by the Cheektowaga. All the witnesses testified with a chart before them. Sometimes they say "here" or "there," but there is nothing to indicate that either the "here" or the "there" was marked on the chart. It is always desirable that such indefinite statements should be made definite by a mark on the chart and a letter or number. This was done in several instances, and locations marked "A," "B," "C," and "X" would be illuminative of the testimony, if we had the chart; but it is lost, and has not come up with the record. This has happened in many other cases. We would suggest that the District Judges impress upon the clerks of the District Courts and all their employés the importance of preserving all charts thus marked in evidence. It makes little difference if a libel, or an answer, or some other filed document goes astray; both sides usually have an accurate copy of it, from which a nunc pro tunc original can be reproduced. But so long as an appeal in admiralty is a new trial on the testimony, no such new trial can be fairly had unless *all* the testimony is brought up with the record.

[2] Speaking solely for himself, the writer would be inclined to the opinion that the Catawissa was free from fault, if "A," "B," "C," and "X" were where from the rest of the testimony he infers they were; but he cannot rely on his inference to reverse the findings of the District Judge, who knew just where they were. Therefore he concurs with his Associates, who are satisfied from the record as it stands that the Catawissa had sufficient space to pass, if carefully navigated, and therefore must be held in fault.

It is undisputed that the Catawissa could not see the disabled flotilla till she actually rounded Negro Point; also that when she had rounded Negro Point on this tide, she had to go on. She came up on the New York side of Blackwell's Island, and had two bends to make before reaching the point of collision. We are satisfied that she blew both

bend signals, one at Eighty-Sixth street for the turn to southward, the other opposite Hallet's Point, for the Negro Point turn to the eastward. It is the regular thing to do; there was no reason why she should not sound them, and her witnesses say she did. That the master of the Mabel did not hear them—or to be more accurate, did not, when testifying, remember that he heard them—is not persuasive. The position of the two vessels at the time was such that any signals of the Catawissa were of no interest to the Mabel; they might well be heard without being heeded or remembered.

The exchange of bend signals as we have often held is a matter of importance. The vessel who first blows them says, "I, whom you cannot see, am about to round this point in front of you." If the response be a single whistle, it means, "I, whom you are about to meet, am navigating to pass you as usual, port to port." If the response be two blasts it means, "My position is such that we can pass better starboard to starboard." If the response be an alarm it means, "I am in trouble and cannot navigate to help you; if you come around you take the risk." The importance of a prompt response to a bend signal whistle is manifest—especially so because the vessels exchanging signals are frequently invisible to each other and their exact relative positions unknown.

Neither of the Catawissa's bend whistles were heard on the Cheektowaga. The master was busy rectifying the disturbance occasioned by the parting of the hawser, and was, it may be, excusable for not personally hearing them; but we think that when he gave his undivided attention to straightening out the sheering tow, he should, knowing it was the hour for east-bound tows to come along, have stationed some one to watch out for bend signals and report them at once so that he could answer with an alarm, thus advising any east-bound tow before she rounded Negro Point that there was trouble of some sort ahead of her.

This was a fault and we are not satisfied on the proof that it did not contribute to the collision. It has been repeatedly held that the burden of proving that any particular violation of the official rules of navigation did not so contribute rests on the vessel which has violated such rule. The master of the Catawissa testifies, and there is nothing in the record to contradict him, that if he had received an alarm in response to his first bend signal, blown at Eighty-Sixth street, he could have gone in the Harlem river between Ward's Island and Mill Rock, rounded to and anchored. Also that, if he had received an alarm in response to his second bend whistle, blown opposite Hallet's Point, he could have rounded to into Pot Cove, where the Mabel was hanging on, and held his tow until the Cheektowaga came along, or he found that the channel was clear. When he heard no response at all, he was entitled to proceed around Negro Point, assuming the channel was clear; and, once he had rounded it on that tide, there was nothing to do but go on and make the best he could of the situation.

We think both vessels were in fault, and modify the decree so as to divide damages, without costs of this appeal.