## THE ARROW.

## THE McALLISTER.

(Circuit Court of Appeals, Second Circuit. April 28, 1914.)

No. 220.

1. COLLISION (§ 90*)—MEETING VESSELS—VESSELS COMING AROUND BENDS IN CHANNEL.

Vessels bound respectively in and out of Harlem river when rounding Horn's Hook cannot be assumed to be on crossing courses, but should follow the meeting rules unless an intention on the part of the down-bound vessel to cross over to the eastern channel has been determined by signals.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 181–186, 196; Dec. Dig. § 90.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. COLLISION (§ 95*)—STEAM VESSELS MEETING—VESSELS PASSING AROUND BENDS IN CHANNEL.

Two tugs meeting when passing around Horn's Hook with tows, alongside both *held* in fault for a collision between their tows, the up-bound tug being in fault for insisting on passing starboard to starboard, although she was further off shore than the other, and the latter, which had been delayed by a vessel in front, for not waiting in the bight of the Hook, as she might have done on the flood tide, until passing signals had been agreed upon, and for not sounding a bend signal at the proper time.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here on appeal from a decree of the District Court, Southern District of New York, holding the tugs Arrow and McAllister both in fault for a collision between a car float in tow of the McAllister and a coal barge in tow of the Arrow. Judge Holt's opinion was delivered orally at the close of the trial and is not reported.

J. T. Kilbreth, of New York City, for the McAllister.

W. J. Martin, of New York City, for the Arrow.

Herbert Green, of New York City, for libelants.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. The McAllister with a car float on each side was coming down the Harlem river from 102d street, Manhattan, bound for Pier 50, East River. The tide was strong flood. She kept well on the Manhattan side heading into the bight at Horn's Hook. Behind her came the Transfer No. 5 also with two car floats; her course was further out in the stream, and she had overtaken and passed the McAllister before Horn's Hook was reached. Transfer No. 21 also with two car floats came through between Mill Rock and Ward's Island behind the other vessels, but passed them both and reached Horn's Hook first; from there, heading to buck the tide, she proceeded to the east channel of Blackwell's Island. As she reached Horn's Hook, Transfer No. 5 did the same, following No. 21. The

Sound steamer Pequonnock bound from New Bedford to New York came through Hell Gate, crossed ahead of the other three vessels, and went down the west channel of Blackwell's Island; apparently her crossing somewhat delayed the movement of the others. At Horn's Hook there is a high bluff, and a vessel which has been in the bight above it and undertakes to pass it cannot see (or be seen by) a vessel coming up along the Manhattan shore until either or both have proceeded far enough to see around the front of the bluff.

The master of the McAllister testifies that he sounded a bend whistle for Horn's Hook when about off 93d street. He alone testifies to this whistle; he did not refer to it in his report to the inspectors. When he reached 92d street he got into difficulty with the tug Moran towing two dump scows bound for 96th street, signals were given, the McAllister had to stop and back while the Moran crossed her bows and went into the Astoria Ferry slip to get out of her way. This delayed the McAllister, and further down she was again delayed, having to stop astern of the No. 5, which had herself stopped to let the Sound steamer pass. She was then in the bight, and when No. 5 had moved ahead so as to make good clearance, the McAllister herself proceeded to pass the Hook. Her master then first saw the Arrow, the latter being between 86th street and the Hook (89th street). He knew, however, that there was a vessel coming up because he had heard her bend whistle—blown by the Arrow when off 82d street—and also an exchange of two-blast signals between her and No. 5.

The Arrow was coming up with a coal barge alongside through the westerly channel of Blackwell's Island about 200 to 250 feet off the Manhattan shore. She sounded her bend whistle for Horn's Hook when about off 82d street. She passed the Sound steamer which was coming down about midchannel, starboard to starboard. She saw No. 21 making its way over towards Blackwell's Island. As she proceeded further up river and had about reached 86th street, she saw No. 5 coming out by the Hook, they exchanged two blast whistles, and passed starboard to starboard. She heard no bend signal from the McAllister, nor any other from her and, of course, did not know of her presence until she saw her (or the bows of her car floats), when both had got so far along that the bluff no longer hid each from the other. The Arrow's master expressly states that at that time the McAllister was closer to the New York shore than the Arrow was.

As to the facts above recited there is substantially no dispute. As to the signals exchanged there is a conflict on the testimony. The master of the McAllister says that he blew first—a single blast so as "to give the boat coming up a chance to go in the Gate or into Harlem river, whichever way she was going." That the Arrow answered with two blasts, whereupon he blew an alarm which the Arrow again answered with two blasts, after which the McAllister blew a three-blast signal and stopped and backed. It is not disputed that she did stop and back; indeed, she is criticized by the Arrow for doing so.

In his statement to the inspectors the master of the Arrow says that he blew first—a two-blast signal—which was answered by one, whereupon he blew an alarm to which he received no answer. On his direct

examination he testified that he blew a two-blast signal, received no answer, blew a similar blast, received no answer to it, and then blew an alarm, after which he received a single whistle when the vessels were close together. On cross-examination, however, he admitted that his statement to the inspectors, made while the facts were more fresh in his recollection, was probably the correct one. The weight of testimony—especially that of independent witnesses from the Pequonnock —seems to support the master of the McAllister as to the sequence of whistles. But the sequence is not specially important; all the signals from the McAllister called for navigation port to port, all those from the Arrow for navigation starboard to starboard. The vessels came into collision off the Hook; the witnesses vary in their estimates of the distance from 60 to 100 or 200 feet.

[1] We do not think that the navigation of the vessels when encountering each other at Horn's Hook was to be controlled by the starboard hand rule for vessels on crossing courses, although at some time their respective headings were such that their courses if prolonged would cross. The Supreme Court, in The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, held that the starboard hand rule is ordinarily inapplicable to vessels coming around bends in channels, which may at times bring one vessel on the starboard of the other. That vessels must be known to follow the courses of the river bank. That, although vessels navigating in a river may sometimes be on crossing courses under the rule, that depends on their presumable courses; that the question always turns on the reasonable inference to be drawn as to a vessel's future course from her position at a particular moment, and this greatly depends on the nature of the locality where she is at that moment. We are not satisfied that it is a safe and proper presumption that a vessel bound down the Harlem river which has reached the bight above Horn's Hook, keeping along the New York shore on her way down, is going to take the easterly rather than the westerly channel to pass Blackwell's Island. Either course is open to her. A vessel coming up the river in that locality is "meeting" a vessel coming down, and if she wishes to navigate on the theory that the vessel she is meeting is going to cross over at that point, she should ascertain if that be the intention by exchange of signals. Until such intention be thus developed, the safe course for both vessels is to follow the "meeting" rule.

It seems to be thought that this court has held that the starboard hand rule applies to vessels encountering each other in the vicinity of Horn's Hook. The case then before us was that of The Waterman (D. C.) 82 Fed. 478, and Transfer No. 8, 96 Fed. 253. The Waterman was going up the westerly channel of Blackwell's with a heavy hawser tow in midchannel. The statement of facts does not show where she was bound, but the circumstance that with a hawser tow in a strong flood tide she was in midchannel seems to indicate that she was bound through the Gate. Transfer No. 8 came out of the bight above Horn's Hook and headed diagonally across the channel to cross the bows of the Waterman and get into the easterly channel of Blackwell's Island. Judge Brown (The R. H. Waterman [D. C.] 82 Fed. 478) held both

vessels in fault for various reasons. He pointed out the divergence of the lines of traffic above Blackwell's Island one to the Gate, the other up Harlem river, and that a vessel, which comes down Harlem river on the line of Avenue B and undertakes to go over to the easterly channel of Blackwell's Island, crosses the Gate line of traffic and the course of a vessel bound up on that line. In the course of his discussion of the contention that the vessel bound up should give a bend signal when below Horn's Hook, even though it be her intention to go into the Gate and not into the Harlem river, he said:

"If such signals are omitted by vessels ascending with the flood tide, the situation of vessels coming out of the Harlem river becomes specially difficult and dangerous. For the duty of 'keeping out of the way' is cast by law upon them both because they have the other vessels on the starboard hand and because the latter are going with the tide and the former against it."

Upon appeal to this court (The Transfer No. 8, 96 Fed. 253, 37 C. C. A. 462), we held the Waterman solely at fault because the whole trouble was caused by her failure, through a bend whistle, to inform the down-coming vessel which, while above the Hook, could not see her, that she was to be found in the river as soon as such vessel cleared the bluff. Our opinion contains this clause:

"We fully concur with the finding of the District Judge that at this part of the river, 'on a strong flood tide, there is not reasonable and sufficient time and space for the * * * maneuvers necessary to avoid collision with any certainty, if signals are not exchanged before the vessels themselves are seen.' The responsibility for this collision rests upon the vessel which, by failure to give notice of her own approach, deprived the other of the 'reasonable and sufficient time and space' which it needed properly to carry out the obligations laid upon it by the starboard hand rule."

This should not be taken as a ruling that vessels bound respectively in and out of Harlem river when rounding Horn's Hook are on crossing instead of meeting courses. The opinion quoted refers only to the facts of the case under consideration—whether the vessels were on crossing courses or were on meeting courses with the up-bound one in midchannel and the down-bound close to the Manhattan shore. The Transfer No. 8 would have had no right without agreement by exchange of signals to try to cross the bows of the Waterman, if she had known The Waterman was there in time to maneuver to avoid her.

[2] In the case now before us, whether the two vessels be considered to be on meeting courses, or whether the special circumstance rule applies, the Arrow, further out in the channel than the other when they saw each other, was in fault for insisting by signals and by navigation on going in between the McAllister and the shore in order to pass starboard to starboard. We find nothing in the excuse she offers that she might otherwise have been swept over on Mill Rock; her tow was not on a hawser, and after the collision she found no difficulty in taking the course she should have taken in the first place.

The McAllister is also in fault for two reasons. While she lay in the bight she knew there was a vessel coming up somewhere from below the Hook, for she heard her bend whistle. She knew also that this vessel was passing No. 5 starboard to starboard, for she heard the exchange of two-blast whistles between those vessels, before she

saw the Arrow. Knowing an invisible vessel was approaching through the waters she was about herself to enter into, she should not have moved out of the bight (with a flood tide she could lie there) until by exchange of signals she had arranged with the unseen vessel how they would navigate when they encountered each other. She is also in fault for not sounding a proper bend whistle herself. Conceding that her master is correct in stating that he did sound one at 93d street, which was a proper distance from the Hook, that signal became valueless because, by reason of his difficulty with the Moran and the delay occasioned by No. 5, so much time elapsed before he reached the Hook that it was not to be expected that any up-going vessel then near the Hook could possibly have heard his signal which was sounded when such vessel was far below. The Zouave (D. C.) 90 Fed. 440. The great importance of giving careful attention to these bend whistles has been repeatedly pointed out; in Transfer No. 8, supra, and in our recent opinion in Lehigh Valley Co. v. The Catawissa, 213 Fed. 14, 129 C. C. A. —— (February 10, 1914).

The decree is sustained, with interest and costs.