### THE NEW HAMPSHIRE.

### THE PORTCHESTER.

#### (Circuit Court of Appeals, Second Circuit. June 22, 1915.)

#### Nos. 308, 309.

COLLISION ⟨key⟩95—STEAMER AND MEETING TOW—FAULT.

A steamer passing up East River against an ebb tide, and which agreed by signal to pass port to port a tug coming down with a tow on a hawser through the eastern channel of Hell Gate, *held* solely in fault for a collision with the tow, on the ground that she was moving at too great speed and should have waited for the tow to clear Hallett's Point.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ⟨key⟩95.

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeals from the District Court of the United States for the Southern District of New York.

Haight, Sandford & Smith, of New York City (John W. Griffin, of New York City, of counsel), for appellant New England S. S. Co.

Carpenter & Park, of New York City (Samuel Park, of New York City, of counsel), for appellees the Portchester and others.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. October 15, 1912, at about 5:30 p. m., the steam tug Portchester was approaching Hell Gate on an ebb tide of four knots an hour bound for New York. When about off Negro Point she gave the usual bend whistle, and as usual on an ebb tide headed over to Hallett's Point, so that her tow might swing out behind her in going down the East River. The steamer New Hampshire, going up the East River bound for New Haven, as she approached Hallett's Point in the east channel close to the Astoria shore, saw the towing lights and red light of the tug. Thereupon she blew a signal of one blast, which the tug answered with one blast. This constituted an agreement that the vessels were to pass each other in the east channel port to port. After blowing the one blast the steamer slowed down, but in passing Hallett's Point ran right across the hawser between the tug and the tow, as the result of which there was a mixup, in which the scow S. & R. No. 47 sustained damage.

The owners of the scow filed a libel to recover their damages against the steamer, and the claimant of the steamer brought in the tug under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi). The master of the steamer testified that when he discovered the tow it was impossible for him to pass port to port, because it was coming up so close to the Astoria shore. Therefore he blew two whistles, reversed full speed astern, which threw his bow to port, his propeller being left-handed, and put his wheel hard aport to correct this effect, notwithstanding which he ran into the tow. On the other hand, the witnesses for the tug explained the steamer's sheer as a result of the ebb tide striking her starboard bow as she came out of the eddy current running along the Astoria shore. Judge Learned Hand held the steamer solely at fault on the ground that she was going too fast to control her movements when she made out the location of the tow. He also found that the proofs showed it to be the custom for steamers in the situation of the New Hampshire on an ebb tide to wait until a down-coming tow has cleared Hallett's Point. We think he was right on both points.

Counsel for the steamer contended that the tug should have approached Hallett's Point at a greater angle, so that the ebb tide would have swung her tow further off, leaving room for the steamer to pass port to port. It may be that the navigation of the tug might have been better in this respect. Still the steamer could easily have prevented the collision, had she slowed down or stopped to ascertain just where the tow was and let it pass; whereas the tug with a long hawser tow on the ebb tide was quite unable to manœuvre. Two barges lying in the east channel east of Mill Rock reduced the waterway considerably, and were a reason for the tug's passing closer to the point than usual. It was pointed out in addition that Judge Addi-

son Brown severely criticized a contention that an upward-bound vessel should have waited off Hallett's Point on an ebb tide in The City of Springfield (D. C.) 26 Fed. 158. But this was written when there were three channels in Hell Gate, viz., the east, the middle and the west. Since that time Flood Rock has been removed, and there are two, one on the east and the other on the west side of Mill Rock. The rationale of his decision was that the whistles exchanged in that case did not indicate to the steamer going up which of the three channels the tug was going to take, and the steamer had no reason to expect her to take, as she did, the most dangerous one. If there had been but one channel, the judge admitted that it would have been the duty of the steamer going against the tide to wait for the tug coming with it. Exactly the same rule applies when the vessels have come to an understanding that they are to pass port to port in the same channel, The Galatea, 92 U. S. 439, 445-446, 23 L. Ed. 727. Judge Brown recognized this difference in The Dasori (D. C.) 47 Fed. 330. These latter cases are applicable to the present situation, in which the vessels had agreed to pass port to port in the east channel. Under analogous circumstances we have held it to be the duty of steamers going down the Harlem River on a flood tide to wait above Horn's Hook until the navigation with an approaching steamer has been agreed upon. The Arrow, 214 Fed. 743, 131 C. C. A. 49; Transfer No. 12, 221 Fed. 409, ——— C. C. A. ———.

The decree is affirmed.