# THE TRANSFER NO. 8.

## THE R. M. WATERMAN.

### (Circuit Court of Appeals, Second Circuit.   July 18, 1899.)

### Nos. 151, 152.

1. COLLISION—FAILURE TO GIVE PROPER SIGNALS—STEAMERS NEARING BEND IN CHANNEL.

Inspectors' rule No. 5, which requires steamers when nearing a short bend or curve in the channel, where from the height of the banks or other cause a steamer approaching from the opposite direction cannot be seen from a distance of half a mile, to signal upon arriving within half a mile of such curve or bend, as literally construed, is imperative on every steamer "nearing" such short curve or bend, whatever may be her intention as to future navigation after she shall have reached it, and the rule applies to a steamer passing up the west channel of the Harlem river on approaching Horn's Hook, though bound up the Sound.

2. SAME—DETERMINING FAULT—MANEUVERS OF VESSEL IN DANGEROUS SITUATION.

Where the failure of a steamer to give the required signals on nearing a bend in the channel which hid her from a vessel approaching from the other direction was plainly the cause of the two vessels being placed in a dangerous situation, and a collision resulted, the maneuvers of the other vessel in attempting to avert the collision will not be severely scrutinized, for the purpose of placing upon her a part of the responsibility.

Appeal from the District Court of the United States for the Southern District of New York.

These causes come here upon appeals from decrees of the district court, Southern district of New York, holding the tugs Transfer No. 8 and R. M. Waterman both in fault for a collision that took place on December 7, 1896, near the mouth of the Harlem river, off Horn's Hook, at Ninety-Sixth street, by which the barge Maine, belonging to the libelant Philadelphia & Reading Railroad Company was damaged and sunk, and the Waterman sustained damages to her propeller, etc.   The Maine was the starboard boat of four barges that were going up the East river in a strong flood, in tow of the Waterman, on a hawser of about 30 fathoms.   The facts attending the collision are fully set forth in the opinion of the district judge as follows:

"The tide at Horn's Hook was running probably from three to four knots, and the speed of the boats was about four knots more.   They went up in about mid-channel on the westerly side of Blackwell's Island, and, when off Eighty-Fourth street, Transfer No. 8 was seen emerging from behind the point at Horn's Hook, heading in a southerly direction diagonally across the river, on a line about parallel with a line drawn from Horn's Hook to Blackwell's Island light, and about 200 feet above that line.   Transfer No. 8 had two car floats in tow, one on each side of her, 247 feet long, and each loaded with cars. She had come down the Harlem river, and rounded to port across the stream, in order to go to the easterly side of Blackwell's Island, where the flood tide was not so strong as on the westerly side.   A little to the starboard of the tug Waterman and her tow was the tug Genesta, coming up with a schooner in tow on a hawser about 30 fathoms long, and overtaking the Waterman.   When No. 8 first became visible, the tug Genesta was probably between the Waterman and her tow, and about 30 feet to starboard of the tow.   She was gaining rapidly upon the Waterman, and, as soon as No. 8 became visible, she gave her a signal of one blast, indicating that she would go ahead of No. 8.   The pilot of No. 8 claims that he had just previously given a signal of two whistles,

designed for the Waterman; that when the Genesta's signal was heard, he was giving signals to his engineer to slow and stop, because he knew that the Genesta must go ahead of him; that the Genesta very soon afterwards gave a second signal of one whistle, when a little ahead of the Waterman, which was heard by No. 8, and was immediately answered by the latter with one whistle; that No. 8 soon after gave two whistles to the Waterman; and that by these signals it was intended to bring No. 8 to a stop, and that the Genesta with her tow should pass in front of No. 8, while the Waterman with her tow should go astern of her. No. 8 came to a stop when a little more than half way across the channel towards Blackwell's Island. The Genesta and her tow passed ahead and within 25 feet of her, but the Waterman's tow, not being far enough to the westward to clear, the stem of the barge Maine struck the starboard side of No. 8's starboard float about 18 feet from her stern." 82 Fed. 478.

Henry W. Taft, for the Transfer.
Philip Carpenter, for the R. M. Waterman.

Before WALLACE and LACOMBE, Circuit Judges, and THOMAS, District Judge.

LACOMBE, Circuit Judge (after stating the facts as above). The district judge held the Waterman in fault for various acts and omissions, which need not all be discussed, inasmuch as we are satisfied that one of them—viz. her failure to give proper signals—was the proximate and sufficient cause of the catastrophe. The conditions of navigation at this part of the river are accurately and clearly set forth by the district judge:

"In going past Blackwell's Island by the westerly channel, the Harlem river diverges five points to port around that point. The direct channel to the Sound, through Hell Gate, diverges about half a point to starboard. There is a large and constant traffic up and down the Harlem river around the Hook, and a still larger traffic past the Hook to the eastward, so that these lines of traffic cross each other, when boats on the flood tide go down as usual to the eastward of Blackwell's Island. The channel between Horn's Hook off Eighty-Ninth street and Mill Rock to the eastward, forming the north of the Harlem river, is less than 1,200 feet wide; and between Mill Rock and the flats off Ninety-Third street there is only about 600 feet of available breadth of water. Vessels coming down the Harlem river in the middle of the channel, heading, * * * as did No. 8, for the line of Avenue B., cannot be seen by vessels coming up in mid-channel below the Hook [and, we may add, cannot see the upcoming vessel] until they are so near to each other that on a strong flood tide there is not reasonable and sufficient time and space for the observation and maneuvers necessary to avoid collision with any certainty, if signals are not exchanged before the vessels themselves are seen."

The witnesses from Transfer No. 8 testify she gave a long blast of her whistle somewhere between Ninety-Second and Ninety-Sixth streets, and the district judge credited their testimony, although he found that this whistle was not heard by those on the Waterman. We see no reason to discredit this evidence from Transfer No. 8, and concur in the conclusion that she sounded a bend-warning whistle at the proper time. Concededly no such whistle was blown by the Waterman, or, indeed, by the Genesta. They did not answer the Transfer's warning signal, because they did not hear it, and they did not sound any warning signal of their own, because they assumed that they were not under any obligation to do so, inasmuch as, although

nearing a bend, where the height of the bank cut off all view of an approaching vessel, they did not intend to make any turn themselves when they reached the bend.

Inspectors' rule No. 5 provides as follows:

"Whenever a steamer is nearing a short bend or curve in the channel, where, from the height of the banks or other cause, a steamer approaching from the opposite direction cannot be seen for a distance of half a mile, the pilot of such steamer, when he shall have arrived within half a mile of such curve or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by the pilot of any approaching steamer that may be within hearing. Should such signal be so answered by a steamer upon the farther side of such bend, then the usual signal for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such pilot be not answered, he is to consider the channel clear and govern himself accordingly."

This rule, literally construed, is imperative upon every steamer "nearing" such short bend or curve, whatever may be her own intention as to future navigation after she shall have reached it. It makes no difference whether she intends to curve around the bend, or to anchor off it, or just short of it, or to continue on in a straight line beyond it; if, after she has reached a point half a mile away from it, she intends to continue her movement, so as to bring herself nearer to it, she is "nearing" such bend, and the language of the rule requires her to sound the bend-warning whistle. And it seems to us that the spirit of the rule would require such an interpretation, even if the language were obscure. The signal, which gives warning that there is a hidden vessel nearing the bend, is manifestly designed to notify the other vessel approaching from an opposite direction, not only that if her own approach is slow she may suddenly find another vessel in her water, but also that if her own approach is swift she is likely, on passing the bend, to find herself suddenly in close proximity to another vessel. As the district judge says: "The reasons for the inspectors' rule are almost equally applicable to vessels going on either side of the Hook;" and in our opinion the language of the rule makes the giving of a bend-warning signal by boats approaching such bend from either side imperative, no matter what may be their future course after reaching the bend. We conclude, therefore, that the Waterman was clearly in fault for not giving such signal when nearing Horn's Hook, and are satisfied that her failure to do so was the proximate and efficient cause of the collision. By reason of her failure to give timely warning of her approach, the Transfer, incumbered with two heavy car floats, ran out of the shelter of the Hook into the full force of the flood tide, with Mill Rock to leeward, and found herself in the presence of two ascending tugs and tows on her starboard hand, avoidance of which, under the circumstances, would prove to be a most difficult matter.

The district court held the Transfer No. 8 also in fault, because she kept so long near to the New York shore. This finding is a corollary to the conclusion of that court that the inspectors' rule did not require a bend-warning signal from vessels approaching the bend, bound up the Sound. Of course if no such signals from them

can be counted on, the vessel bound down should keep far enough out in the river to see what perils lie ahead of her, since she is not to hear of them. But if the inspectors' rule be obeyed,—and the Transfer was entitled to assume that it would be,—she might have held her course under the shelter of the Hook, with the assurance that when she left it she would find no approaching vessel within half a mile. Inasmuch as we hold that the rule required a bend-warning signal from the upcoming tugs, we must acquit the Transfer of fault in navigating under the assumption that there was nothing below the bend within a half a mile.

The district court further held the Transfer in fault for undertaking the dangerous maneuver of passing ahead of the Waterman and behind the Genesta. We do not find it necessary to enter into any elaborate discussion of the navigation of the vessels after they came in sight of each other. This may not be a case for the application of the rule in extremis, but the fault of the Waterman is so glaring, and its consequences precipitated a situation involving such difficulties, that we are not inclined to be severely critical of the maneuvers by which the Transfer undertook to escape from it. We fully concur with the finding of the district judge that at this part of the river, "on a strong flood tide, there is not reasonable and sufficient time and space for the * * * maneuvers necessary to avoid collision with any certainty, if signals are not exchanged before the vessels themselves are seen." The responsibility for this collision rests upon the vessel which, by failure to give notice of her own approach, deprived the other of the "reasonable and sufficient time and space" which it needed properly to carry out the obligations laid upon it by the starboard-hand rule.

The decrees of the district court are reversed, with costs to the claimant, owner of the Transfer, against the Waterman in the first suit, and against libelant in the second suit, and causes remitted, with instructions to decree in the first suit in favor of libelant against the Waterman, with interest and costs, and to dismiss the libel against Transfer No. 8, with costs, and in the second suit to dismiss the libel, with costs.