## THE CHICAGO.

### THE CITY OF AUGUSTA.

(Circuit Court of Appeals, Second Circuit. July 25, 1903.)

#### No. 165.

**1. COLLISION—STEAM VESSELS CROSSING—DUTY OF PRIVILEGED VESSEL.**

The privileged one of two crossing steam vessels has a right to rely on the performance by the other of her duty to keep out of the way so long as it is possible for her to do so, at least in the absence of some distinct indication that she is about to fail in such duty; and, so long as such right continues, it is the duty of the privileged vessel to maintain her course and speed, unless in extremis.

**2. SAME—CONTRIBUTORY FAULT.**

A collision occurred at night, on the Hudson river, about 200 feet off the New York piers, between the steamship Augusta, passing up from

the sea, and the ferryboat Chicago, crossing from Jersey City. The Chicago was clearly and grossly in fault, for failing to see the Augusta until the latter was within 500 feet of the point of collision, and for then attempting to cross ahead in violation of the rules, when she might have kept out of the way by starboarding and reversing. *Held*, that under the settled rule that, in such cases, contributory fault on the part of the privileged vessel must be clearly shown, the Augusta could not be held in fault for going at a speed of 8 miles an hour, which she kept until within 500 feet of the point of collision, when she stopped her engines, it being her duty, as the privileged vessel, to maintain her speed; nor for not reversing until immediately before collision, which, if an error, was one in extremis; nor because of her nearness to the piers, which did not prevent the Chicago from keeping out of the way, nor in any way contribute to the collision.

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 102 Fed. 991.

This cause comes here upon an appeal by the Ocean Steamship Company from a final decree of the District Court, Southern District of New York, which held both vessels in fault for a collision between the steam ferryboat Chicago and the steamship City of Augusta.

Herbert Barry and Julian T. Davies, for appellant.

Henry G. Ward, Le Roy S. Gove, Henry E. Datter, and Amos H. Stevens, for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. On October 31, 1899, the ferryboat Chicago left her slip at Jersey City at 12:47 a. m., bound for the upper slip at the foot of Cortland street, New York. The night was dark and overcast, the atmosphere free from fog or haze, the wind was from the northeast, and the tide at the last of the ebb, but still running strong. She followed her usual course, heading across the river for Starin's Pier, just above her slip, intending when near the pier to head down and pass in close to the lower corner. The Fanwood, a ferryboat of the Central Railroad of New Jersey, was at the same time crossing the river below the Chicago. She started two or three minutes earlier, but had further to run. Her slip adjoined the Chicago's slip on the south. The Chicago proceeded on her course at her usual speed; her captain hearing no signals from anybody, and seeing no vessel to be avoided, until he perceived the Fanwood stopping about abreast of him and swinging to port. Thereafter, for the first time, he perceived the city of Augusta—her hull, masthead light, and red light—coming straight up the river at a speed which he estimated at about 12 miles an hour. He testified that the City of Augusta at that time was 400 feet below him, was about 150 feet off the line of the piers, and her course 250 feet east of the Chicago. She was on his starboard hand, and was the privileged vessel. The statutory provisions applicable at the time are found in Act Cong. June 7, 1897, c. 4, 30 Stat. 101, 102 [U. S. Comp. St. 1901, pp. 2883, 2884]:

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

"Art. 21. When by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, slacken her speed or stop or reverse."

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

"Art. 29. Nothing in these rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case."

## The inspectors' rules in force were:

"Rule 2. When steamers are approaching each other in an oblique direction, as shown in the diagram of the fourth and fifth situations, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other, which latter shall keep her course and speed; the steam vessel having the other on her starboard side indicating by one blast of her whistle her intention to direct her course to starboard, and two blasts if directing her course to port, to which the other shall promptly respond; but the giving and answering signals by a vessel required to keep her course shall not vary the duties and obligations of the respective vessels.

"Rule 3. If when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle; and, if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

"Rule 6. The signals, by the blowing of the whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting head and head, or nearly so, but at all times when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

It will be noted that rule 2 had not at the time been modified, as it subsequently was, by requiring the burdened vessel to direct her course to starboard. In the situation in which he found himself, the duty of the master of the Chicago was plain. If too close to swing to starboard when the ebb might set him down upon the Augusta, he should at once have sounded one blast, have put his helm hard to starboard, stopped, and reversed. Had he done so, with a boat which swings as sharply and checks herself as quickly as the ordinary paddle-wheel ferryboat, he would have laid the Chicago, as the master of the Fanwood laid that vessel, in safety alongside the course of the City of Augusta, and, as the latter moved on, he could have passed under her stern. Instead of that, as soon as he saw the Augusta he sounded a two-blast signal, gave a jingle bell to his engine room to increase speed, and dashed straight ahead in an effort to pass in front of the bow of the rapidly approaching steamer. Such navigation was not only contrary to the articles, but was utterly reckless. When

he actually sighted the steamer, the master of the Chicago had not yet passed beyond the point at which it was possible for him to swing off to port; and, if he was so close to it that the nervousness induced by apprehension of danger obscured his judgment, his own vessel's navigation was the direct cause thereof. A careful lookout would have seen the City of Augusta much earlier—probably before the Chicago was halfway across the river—and would have thus revealed the fact that a privileged vessel was moving northward across her course. Moreover, irrespective of any lookout's report, the attention of the master of the Chicago was challenged by the stopping and the swing up river of the Fanwood, which warned him that the latter boat had encountered something in her navigation which called for maneuvers as of a burdened vessel by one crossing from west to east. Clearly the Chicago was in fault—grossly in fault—for the collision. Her counsel conceded her fault in the District Court, and concedes it here. The only question presented by the appeal is as to the navigation of the City of Augusta. Some of the findings of fact of the District Court—e. g., speed of Augusta, distance from pier line, etc., are disputed by appellant—but her navigation will be considered on the basis of the narrative given in the following excerpts from the opinion of the District Judge:

"The City of Augusta * * * was a single-screw propeller, about 302 feet long by 40 feet beam. The ferryboat was 203 feet by 65 feet beam. * * * The City of Augusta, after a detention of 11 minutes at quarantine, left there at 12:14 a. m., and was abreast of Castle Garden at 12:45. * * * Above Castle Garden her speed was probably about 10 knots. Her master estimates her distance from shore at Castle Garden at about 900 feet. It is his practice, as he testifies, to give the order to slow on reaching Castle Garden; but on this occasion, observing the Central ferryboat Fanwood coming across from her Jersey slip, * * * and approaching her slip at Liberty street, he continued on without slowing in order to pass ahead of her, giving to the Fanwood several signals of one whistle, indicating that he would pass ahead. The Fanwood, he says, answered his third signal * * * [The master of the Fanwood did not hear the earlier signals, and the testimony from all sides indicates that the wind probably interfered with the transmission of signals], * * * turned up the river, and allowed him to pass her about 200 feet distant, off Pier 8, whereupon he gave the order to slow. About a minute afterwards, as he says, he observed the Chicago approaching her slip, and gave her successively, as he testifies, at least three separate signals of one whistle, and kept on, intending to pass ahead of her as he had passed the Fanwood. He heard no signal or answer, as he testifies, from the Chicago, though the Chicago gave him two whistles at about the same time. The pilot of the Fanwood testifies that he heard only one of these signals from the Augusta, followed by an immediate alarm, to which the Chicago within one or two seconds replied with a signal of two blasts. * * * [Whether or not the master of the Fanwood understood a rapid succession of the Augusta's single whistles to be an alarm, his testimony indicates that the Augusta saw the Chicago, and signaled her more than once, before the latter blew the two whistle signal which her master says he gave immediately on sighting the Augusta.] * * * The master of the Augusta says that after his signals to the Chicago he gave the order to stop his engine, but no order to reverse until his stem was within about 25 feet of her. * * * The Augusta, when she signaled and slowed, was not over 500 feet below the place of collision. * * * When the Chicago was two-thirds past the Augusta. she was struck at about right angles by the latter's stem."

This court has repeatedly held, following the Supreme Court, that a vessel which is primarily in fault for a collision cannot shift its con-

sequences in part upon the other vessel without clear proof of the contributing negligence or fault of the latter. Her own negligence sufficiently accounts for the disaster. The reckless navigation of the burdened vessel in this case calls for the application of our comments in The Transfer No. 8, 96 Fed. 253, 37 C. C. A. 462:

"The fault of the Waterman is so glaring, and its consequences precipitated a situation involving such difficulties, that we are not inclined to be severely critical of the maneuvers by which the Transfer undertook to escape from it."

The District Court held the Augusta in fault (a) for running at unduly high speed; (b) for navigating too close to the pier line; (c) for not keeping a proper lookout; (d) for not sooner reversing. The first three of these assignments may be considered together. It is argued by the appellant that 10 knots an hour was not excessive at Castle Garden, and that, at that moment becoming involved in navigation with the Fanwood, the rules forbade the Augusta to reduce speed; that the Chicago was sighted by the Augusta long before the District Court finds that she was; and advances other propositions which need not be discussed. The steamer's speed, her proximity to the piers, and the circumstance that she evidenced her observation of the Chicago by a signal only after the Fanwood had checked and swung, were not such contributing faults as will relieve the vessel primarily in fault. When the Augusta started up from Castle Garden, her master carefully scanned the east shore with his glasses, and saw that every ferry slip was free from boats whose exit his approach might interfere with. The boats eastward-bound, and as to which the Augusta was privileged, could with perfect ease, and without interfering with making their slips, have checked their course and let her pass, whether she was 200 feet or 600 feet from the pier line; and her speed being observed, as well as her course, and the rules giving assurance that both would be kept, such boats would have had no difficulty whatever in avoiding her. If it be said that a speed of 8 knots would have failed to bring her to the point of intersection before the Chicago cleared it, it may be replied that a speed of 12 knots would have carried her beyond that point before the Chicago reached it. While the Fanwood was the nearest boat, while signals were being interchanged with her, and efforts made to secure such navigation as would not result in a collision, the navigator of the Augusta could not be expected to do more than observe the Chicago, and see that she did not get so close to the danger line as to be unable to conform her navigation to the rules, and thus leave him the clear course he was entitled to receive from her as a burdened vessel, so soon as he should be disengaged from the Fanwood. If from the time the Chicago left her Jersey slip until the moment her master sighted the Augusta passing the Fanwood, she had been constantly under the most careful scrutiny of the navigators of the Augusta, it is not apparent that under the rules the latter could properly have done otherwise than they did. The Chicago was a burdened vessel on an intersecting course, drawing constantly nearer to the course of the privileged vessel. She was approaching, it is true, without giving notice by signal of what she proposed to do; but, while the

Fanwood and Augusta were exchanging notifications of intent, it might well be expected that the Chicago would refrain from interjecting her own blasts. And she had not yet approached so close to the course of the Augusta as to warrant the latter in disobeying the twenty-first article. It was pointed out in The Britannia, 153 U. S. 138, 14 Sup. Ct. 795, 38 L. Ed. 660, that the navigators of privileged vessels should not be too quick in assuming that burdened vessels are not going to yield to them, although their behavior may be erratic. The case at bar is closely parallel to that of The Delaware, 161 U. S. 466, 16 Sup. Ct. 516, 40 L. Ed. 771, where the Talisman was held free from fault, although she twice sounded signal blasts, and then an alarm, none of which were answered, "but did not change her helm or reduce her speed before collision." "Special circumstances" will sometimes render a departure from the rules necessary, but unless the navigator of a privileged vessel acts on the assumption that both vessels are going to obey the rules, until he is advised to the contrary, his nervous vacillation will often precipitate the catastrophe the rules were devised to avoid. In the case last cited the court, after pointing out that the vessels were on crossing courses, and not meeting end on, or nearly so, when a change of course by both might be required, most forcibly indicates what should be done:

"That the primary duty of the privileged vessel is to keep her course is beyond all controversy. [As the rule has been amended since, she is under an equal duty to keep her speed.] The divergence between the authorities begins at the point where the master of the preferred steamer suspects that the obligated steamer is about to fail in her duty to avoid her. The weight of English, and perhaps of American, authority, is to the effect that, if the master of the preferred steamer has any reason to believe that the other will not take measures to keep out of her way, he may treat this as a 'special circumstance' rendering a departure from the rules necessary to avoid immediate danger. Some even go so far as to hold it the duty of the preferred vessel to stop and reverse when a continuance upon her course involves an apparent danger of collision. Upon the other hand, other authorities hold that the master of the preferred steamer ought not to be embarrassed by doubts as to his duty, and, unless the two vessels be in extremis, he is bound to hold to his course and speed. The cases of The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, and The Northfield, 154 U. S. 629, 14 Sup. Ct. 1184, 24 L. Ed. 680, must be regarded as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty. If the master of the preferred steamer were at liberty to speculate upon the possibility or even the probability of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness on the part of both which would bring about more collisions than it would prevent."

We do not understand that this clear exposition of the duty of a privileged steamer has since been qualified by the Supreme Court. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126, is cited; but that steamer was advised by signals, which the court held she was conspicuously in fault for not hearing, that the Conemaugh was about to navigate so as to involve risk of collision, should the

New York keep her course and speed. In The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751, the vessels were meeting end on, or nearly so; and a change of course of the Dumois, evidenced by the shifting of lights, was observable to the Argo, and notice to her that the former was not going to starboard, but, on the contrary, was swinging to port across her bows.

The Chicago was seen from the Augusta when leaving her Jersey slip, and again when halfway across the river. Assuming that she was not observed from the Chicago while the latter was engaged with the Fanwood, we are unable to find in that circumstance a contributing fault, because the navigation of the Augusta was the same as it should have been had the Chicago been observed. As was said before, as soon as the Fanwood swung to one side the Augusta slowed, and almost immediately afterwards again sighted the Chicago, and blew her signals (although under no obligation to do so), which were not answered. The distance between the Chicago and the course of the Augusta had then grown short, but still it was possible for the burdened vessel to have done as the Fanwood did. There is evidence that, under reversed engines and a hard astarboard wheel, such a boat could change direction almost eight points without forereaching more than a length and a half. We are of the opinion that it was not fault on the part of the Augusta to hold her course and speed so long as that possibility existed, in the absence of some definite intimation by signal or action that the Chicago was going to fail in her duty. That notification came in the two-blast whistle and the increase of speed. The Augusta did not hear the signal, but, apparently at the same time it was blown, stopped her engines. The District Court found her in fault because she did not reverse—found that, had she done so, the Chicago would have cleared her by a few feet. This may or may not be so. It is close calculation after the event, and we are to deal with the situation as it confronted the master of the Augusta at the time. He says that he did not reverse because, the Augusta having a single, right-handed screw, the action of the screw in reversing would tend to throw her to starboard, and the reduction in speed would aid the Chicago less than the change in course would imperil her. If this were an error in judgment, we think it was an error in extremis, when the navigator was called upon to deal in a few seconds with a perilous situation suddenly produced by the glaring fault of a vessel which had theretofore given no notification that she was about to violate an express rule of navigation, and that the case is on all fours with The Delaware, supra.

For these reasons, the decree is reversed, and cause remitted, with instructions to decree in conformity with this opinion.