THE TRANSFER NO. 10.

THE WILLIAM J. McCALDIN.

(Circuit Court of Appeals, Second Circuit. February 28, 1906.)

No. 100.

COLLISION—TUGS WITH TOWS—MUTUAL FAULT.

The tug McCaldin, with a schooner in tow on a hawser, was proceeding eastward in East river between North Brothers Island and the north shore, when her tow came into collision with a car float on the side of the tug Transfer No. 10. The tide was flood running eastward at four miles an hour or more, and the McCaldin was making 12 miles an hour by the land. She had followed the Transfer, and the latter had rounded to for the purpose of making her landing against the tide at the Oak Point docks, toward which she was proceeding when the collision occurred. The McCaldin was within sight of her for a considerable distance, but kept her speed and passed between the Transfer and the docks. *Held*, that the McCaldin was in fault for not reducing speed to steerage way only and turning toward the other side of the channel so as to pass under the stern of the Transfer. *Held*, also, that the Transfer was also in fault, because the approach of the McCaldin and her tow at such high rate of speed created "special circumstances" and required her, under article 21 of the international navigation rules, as amended by Act May 28, 1894, c. 83, 28 Stat. 82 [U. S. Comp. St. 1901, p. 2870], to take action to avert the collision, which she could have done by holding herself against the tide until the tug and tow had passed.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, holding the steam tug McCaldin solely in fault for collision between her tow the schooner James Young, and a car float in tow of the steam tug Transfer No. 10. The transfer was bound from Jersey City to the docks of the New Haven Railroad at Oak Point opposite to North Brother Island. She had a car float lashed to each side and projecting 200 feet beyond the stem of the tug. She proceeded along the river till about in front of the docks, when she blew a signal to indicate her arrival to those in charge, and, passing on, rounded to under a port wheel. The tide was flood, running to the eastward, and this maneuver brought her around so as to breast the tide. Thereupon she moved on across the channel to make her landing. When about half way across she (or rather her starboard float) collided with the starboard side of the schooner. The McCaldin had followed the Transfer, herself towing the schooner on a hawser of 40 fathoms. She was navigating about in midchannel.

La Roy S. Gove, for appellant.

Wm. Greenaugh, for the Transfer.

James Forrester, for libelant.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The district judge decided the cause at the conclusion of the trial with a brief oral statement of the grounds for his decision. This court is not sufficiently informed to prepare a detailed statement of facts in the case, because of the very unsatisfactory condition of the record. The most important testimony as to location and movements of the vessels was given by witnesses who testified with a chart before them. In consequence, instead of stating

that a vessel was at such or such a point, describing it, they state that she was at the point marked A or B or X, or that she had proceeded on the course marked C. This chart, however, has been lost, and most diligent search has failed to discover it. Under the circumstances, it would be hopeless to undertake a narrative of the movements of the vessels. The most we can do is to indicate what, in view of what seems to be undisputed testimony, should have been the conduct of the respective navigators.

First. As to the McCaldin. Her evidence, including the testimony from the schooner, is itself of a most unsatisfactory character. The master of the schooner testified that the McCaldin passed 1,000 feet in front of the Transfer, but nevertheless the latter's float came in contact with the schooner, which only had her own length and 40 fathoms to go, in order to pass clear herself. And this, although the McCaldin and tow were going "hooked up," full speed, with a four mile tide, while the Transfer was crossing the tide. The mate makes the distance at which McCaldin and Transfer passed 500 feet or more, but that also, if the testimony as to speed is truthful, must have been impossible. Still more unsatisfactory is the testimony from the McCaldin's deck. Unfortunately her master who was at the wheel died two weeks before the trial. Possibly he might have given a different aspect to the case, but we have to decide upon what is before us, and must take the mate's story as that of the McCaldin. It is apparent from his testimony that he at first located the Transfer on the chart at a place where there was only three feet of water. When his attention was called to that, he then located her "half-way off the island," and pointed out the location on the chart. He had already testified that he did not see her sooner nor until he got abreast of her, because of buildings on North Brother Island; and yet it would appear that, from the place where he finally located her, the Transfer could be seen a considerable distance down the river. The same witness further testified that the speed of the McCaldin in still water, with such a schooner in tow, was eight miles. The schooner had foresail and main jib set, the wind was a seven-knot breeze from W. N. W., favorable but not producing much effect on the schooner, because the jib was in the lea of the foresail and the foresail was hauled right fore and aft. But certainly the wind was not operating to check the speed of the tow. The tide was flood, running eastward, very strong, four miles and over. This same witness testified the McCaldin was hooked up and going full speed, and yet stated and persisted in the statement that they were proceeding only six miles an hour by the land.

From the testimony, we conclude that the master of the McCaldin must have seen the Transfer as they were both drawing on towards the Oak Point docks. Manifestly she was in front of him, and the chart indicates nothing to obstruct his view. The master of the Transfer had seen her behind him below the Sunken Meadow, and again when he began to turn. The mate of the McCaldin, as soon as he saw the Transfer, knew what she was and where she was bound. It must be assumed that the master had the same knowledge. When she passed by the railroad docks on a flood tide, he must have under-

stood that she was intending to swing around and make her landing against the tide, or quartering it. The evidence is that in the majority of cases the landing is so made, and it is common knowledge that such a maneuver is of frequent occurrence in a strong tide. In a river through which many vessels are constantly passing, he was approaching a narrow channel—from the black buoy off North Brother Island to the light at Oak Bluff, just beyond the docks is a little over one-eighth of a mile, between 700 and 800 feet. Through this the tide ran at more than 4 miles an hour with a set over to Oak Point which makes it necessary to keep in midchannel. Nevertheless, with knowledge that the Transfer was probably maneuvering to make her dock somewhere ahead of him and on his starboard hand, he rushed on at full speed, steam, wind, and tide bringing it up probably to more than 12 miles an hour, thereby materially shortening the time within which the signals could be exchanged and maneuvers executed when the vessels came in sight of each other. We are of the opinion that these special circumstances called for a reduction of speed to what was barely sufficient to keep steerage. Moreover, if the location which the mate finally indicated on the chart as the place where the Transfer was when he first saw her was what the testimony seems to indicate. it was, the McCaldin's master ought to have seen her heading for her docks at a sufficient distance to have hauled over more towards the island and put himself in position to navigate according to the starboard hand rule. We concur with the district judge, therefore, in holding the McCaldin in fault.

As to the Transfer. Whether or not it was through any fault of hers that the McCaldin was not sooner seen need not be discussed. When she was seen the observer ought to have appreciated that she was in peril. She was, then opposite the dock on the island, in midchannel with a very strong tide. She could not stop her tow. If she tried to swing to the west, the set of the tide would probably drive her tow ashore. If she turned sharply and at once, she might perhaps have worked over to the east and slipped under the stern of the Transfer, but in such close quarters in a strong tideway it could not be expected that her tow would escape. It would probably have been swept down on the Transfer. There were "special circumstances" which are to be duly regarded when navigating under the statutory rules, and which certainly warranted a departure from rule 21, requiring a privileged vessel to keep her course and speed. And, indeed, that very rule was amended in 1894 by adding:

"When, in consequence of thick weather, or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

We think the Transfer should have held herself, as she very easily could, against the tide and allow the tug and tow to pass.

There has been much discussion upon the argument as to whether the place was one which called for the sounding of "bend" signals, but that point need not be decided. The result would be the same either way, because, as we held in The Waterman and Transfer No.

8, 96 Fed. 253, 37 C. C. A. 462, when bend signals are required, they should be blown by both vessels, and in this case neither blew one.

The decree is reversed, with costs to the McCaldin against the Transfer, and the cause remanded to the District Court, with instructions to decree in conformity to the views above expressed.