**STATE OF ALABAMA, a sovereign state of the United States of America, Plaintiff,**

v.

**NATIONAL MARINE SERVICE, INCORPORATED, a corporation, American Commercial Barge Lines, Inc., a corporation, American Commercial Lines, Inc., a corporation, and Jennifer Marine Towing, Inc., a corporation, in personam, and the M/V NATIONAL IDEAL, the M/V DAN J. HOGAN, and the M/V JENNIFER: their engines, hull, tackle, equipment and appurtenances, in rem, Defendants.**

Civ. A. No. 75–594–T.

United States District Court,
S. D. Alabama, S. D.

July 21, 1977.

A. Clay Rankin, III, Mobile, Ala., for plaintiff.

Norman Waldrop, Jr., Mobile, Ala., and Edward S. Bagley, New Orleans, La., for National Marine Service, Inc., and M/V National Ideal.

John J. Broders, New Orleans, La., and George F. Wood, Mobile, Ala., for American Commercial Lines, Inc., American Barge Line Co., and M/V Dan J. Hogan.

Alex T. Howard, Jr., Mobile, Ala., for Jennifer Marine Towing, Inc. and M/V Jennifer.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above-styled cause was heard by the Court without a jury on the issue of liability only on January 24 through January 27, 1977, and was taken under submission on May 25, 1977. The Court having examined the pleadings and the evidence presented at the trial makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The plaintiff is the State of Alabama and is the owner of the Dauphin Island Bridge. The State brought this action against the operators of three tugs for damage to the Dauphin Island Bridge which occurred on November 20, 1975.

2. The three defendants are the owners and operators of the vessels involved in this incident. National Marine Service, Inc. is the owner of the M/V NATIONAL IDEAL, Jennifer Marine Towing, Inc. is the owner of the M/V JENNIFER, American Commercial Lines, Inc. and American Barge Line Company are the owners of the M/V DAN J. HOGAN. The State claims that the negligence of all three tugs combined to cause two separate allisions which resulted in damage to the Bridge at two separate places.

3. The Dauphin Island Bridge is a part of a causeway and bridge system across the Mississippi Sound from Cedar Point, Alabama, to Dauphin Island, also in Alabama, approximately 28 miles south of Mobile. The Bridge provides the only land link to the Island. The span referred to here crosses the Pass Aux Herons Channel, through which also runs the Gulf Intracoastal Waterway (Waterway). It is a vertical lift bridge located at Mile 127.8 of the Waterway. Its open width is 200 feet. (S.Ex.No. 18)[1]

4. The Bridge is protected by a fender system of dumped shell and rock. A pier protection system was added to the fenders in 1971. At the time of the allisions, the fender system was 405 feet long, 272 feet wide at the mouth, and 180 feet wide between the interior fender wales. Seven-pile dolphins are located at each end of the four fenders.[2]

5. The bridge and fender systems were built in accordance with two separate permits from the U.S. Army Corps of Engineers and Coast Guard, and complied with those permits in all respects. (S.Ex.Nos. 1 and 2)

6. The approach to the Bridge from the west is by way of the Pass Aux Herons Channel mentioned above. This channel is straight for about four miles before reaching the Bridge. It has a dredged depth of 12 feet and is 200 feet wide. The channel is

---

1. References followed by numbers refer to trial exhibits introduced and admitted into evidence as follows: "S", the plaintiff, the State of Alabama; "N" on behalf of the NATIONAL IDEAL; "J" on behalf of the JENNIFER. No exhibits were introduced on behalf of the DAN J. HOGAN. The specific exhibit mentioned here is Nautical Chart 11378, Santa Rosa Sound to Dauphin Island, which was introduced by the plaintiff as its Exhibit Number 18.

2. See Appendix "A" on page 1106, which is a reproduction of the relevant portions of a scale drawing of the Dauphin Island Bridge and includes most of the structures and measurements which will be mentioned in this Opinion.

marked by black bouys to the south and red to the north. There is not enough water on either side of the western approach to allow a tug to go out of the marked channel for any significant distance. The approach from the east is through the Waterway, and is made down a short, straight dredged channel from Mobile Bay to the Bridge drawspan. This channel is less than a mile long. (S.Ex.No. 18)

7. The usual procedure for eastbound tugs with empty barges in tow for negotiating the Dauphin Island Bridge in a northwest crosswind or strong following current is to hold the bow of the tow up into the wind and across the channel, and to drop the bow toward the draw at the last minute and let the wind and current "flush" the tug and tow through the Bridge. Since the eastbound tow must make its approach in this manner, it is hazardous for two tows to pass each other in the narrow channel just west of the bridge under adverse weather conditions. It becomes increasingly more hazardous the nearer to the Bridge that the passage takes place. Therefore, it is the practice of tugs approaching the Bridge to contact the bridgetender to check on weather and traffic conditions in the channels on both sides of the Bridge before entering the Pass Aux Herons Channel. Generally, if an eastbound tug is approaching the Bridge from the west in the manner explained above, it will request westbound traffic to hold up and let it negotiate the Bridge first. It is the custom for westbound tugs to allow the eastbound tug and tow to precede them through the Bridge if the eastbound tug has the fair tide since it is common knowledge that such flotillas have difficulty in negotiating the Bridge in a strong wind or current. If the weather is severe, eastbound flotillas will often hold up in one of several suitable areas west of the channel to wait for the weather to change before attempting to pass the Bridge.

8. On the evening of November 20, 1975, the NATIONAL IDEAL, headed east in the Waterway with three empty oil barges, approached the Dauphin Island Bridge from the west. The NATIONAL IDEAL is a twin screw, 1,000 horsepower pushboat and is 71 by 27 feet. Her draft is approximately 8.5 feet. Two barges, one 290 by 50 feet and the other 150 by 50 feet, were "strung out" directly in front of the tug, and the third, also 290 by 50 feet, was "spiked" to the port side of the other two barges, in front and to the port of the NATIONAL IDEAL. (N.Ex.No.8) The barges' drafts were approximately 2.5 feet and they had freeboard of about 9.5 feet. The flotilla was 511 feet long and 100 feet wide.

9. Relief Captain John Wiley was in command of the NATIONAL IDEAL. He had taken command at 6:00 p.m. when the flotilla was about 18 miles west of the Bridge. At that time the wind was out of the northwest at 15 miles per hour and beginning to gust. Captain Wiley was familiar with the area and with the procedures and practices for approaching and passing through the Bridge. (S.Ex.No.15)

10. At the same time, the JENNIFER, heading west in the Waterway, was approaching the Bridge from the east. The JENNIFER is also a twin screw pushboat. She has 1,200 horsepower and is 60 by 20 feet. That night she was pushing two empty 250 by 50 foot barges. The barges were "strung out" directly in front of the JENNIFER. The flotilla was 560 feet long and 50 feet wide. (S.Ex.No.17)

11. Shortly thereafter, the NATIONAL IDEAL entered the Pass Aux Herons Channel and began its approach to the Bridge from the west. At this time, the crosswind had risen to 20–25 miles per hour and was gusting. It was still out of the northwest. The tide was ebbing and combined with the wind to produce a strong west to east current. (J.Ex.No.3) The NATIONAL IDEAL had the fair tide. Wiley put the bow of whe tow close to the north side of the channel and into the wind, so that the flotilla was angled across the channel, thus planning the passage generally used under these circumstances. However, he made no effort to consult the bridgetender about either the weather at the Bridge or the traffic conditions in the approaches to the Dauphin Island Bridge.

12. Around 7:30, when the JENNIFER was about one mile from the Bridge, Captain Jesty Billot contacted the Bridge and talked to bridgetender Robert Imel in order to arrange to have the drawspan lifted so that the JENNIFER could pass through the Bridge. The NATIONAL IDEAL had progressed toward the Bridge and Captain Wiley overheard the conversation between Billot and Imel and radioed Billot to identify the NATIONAL IDEAL. Although he had begun his approach to the Bridge and knew that he would have to pass the JENNIFER in the narrow channel west of the Bridge, Wiley made no request of the JENNIFER to hold up and let the NATIONAL IDEAL pass the Bridge first. Further, he sought no information about the flotilla he knew he must pass under hazardous conditions. Billot told Wiley that he was too busy to talk at that time and would contact him on the other side of the Bridge. The bridgetender then called the NATIONAL IDEAL to inform Wiley that he would hold the Bridge open to let him pass after the JENNIFER cleared the Bridge.

13. The JENNIFER cleared the Bridge at 7:38, (S.Ex.No.13) and as she emerged from the drawspan, Wiley and Billot re-established radio contact. Wiley asked Billot to give the NATIONAL IDEAL the two-whistle or north side of the channel. He gave Billot no reason for this request. It is obvious in retrospect that he asked for the two-whistle side so that he could continue to hold his barges up to port and into the wind and make the Bridge passage as he had originally planned, because it would have been extremely difficult to make the Bridge without keeping his barges to the north side of the channel. Billot refused and insisted on his right to the north side or a one-whistle passing because he also needed the wind to help control his tow. Wiley acknowledged the refusal and agreed to the one-whistle passing. At this time the NATIONAL IDEAL was still a mile away from the Bridge.

14. The two flotillas made a port-to-port passage about half a mile west of the Bridge. Both were angled in the channel, holding into the wind. The NATIONAL IDEAL was initially occupying virtually the entire channel until Wiley dropped the bow of the tow to the south side of the channel to pass the JENNIFER. The passage, although extremely close, was accomplished without incident. The NATIONAL IDEAL, after swinging the bow of its tow to the south, left the channel as the JENNIFER passed, continuing on out of the channel and toward the Bridge without reducing speed. She went aground and came to rest just outside of the southwest fender, with her barges just short of the Bridge. The barges did not strike the Bridge. The Bridge drawspan was lowered at 7:49. (S.Ex.No.13) Although the issue was hotly contested, the preponderance of the evidence is, and the Court so finds, that the NATIONAL IDEAL left the channel due to her own negligence in failing to arrange a safe passage in what was known to be a hazardous area even though she had ample opportunity to do otherwise. She was not forced out of the channel by the JENNIFER, but by her own momentum.

15. The NATIONAL IDEAL remained in this position for some 20 or 30 minutes. Although the stern of the flotilla protruded into the channel, it did not block the Bridge or the channel. In this position neither the flotilla, its crew nor the Bridge were in any serious peril. Wiley then attempted to back the tug and tow back out into the channel to try to get to the north side and make a second approach to the Bridge. As it cleared the fender, the entire flotilla was swept against the dolphins on both sides of the western fender system thus completely blocking the drawspan. The spiked barge was against the north fender and the lead barge against the south fender. The flotilla remained in this position for some 15 to 20 minutes. The NATIONAL IDEAL was unable to move the barges in its position facing the barges, so Wiley pivoted her, and turned her port side to the tow and pushed them back behind the southwest fender. However, this time the lead barge struck the Bridge, damaging Bent Number 242, a short distance south of the Bridge draw.

(S.Ex.Nos.6, 11, and 12).[3] The NATIONAL IDEAL was now pinned against the stern of the tow by the current and unable to move its tow from this position.

16. During these maneuvers, the DEFIANCE, headed west in the Waterway with one loaded rock barge, called the Bridge to arrange passage. The Bridge was lifted at 8:49 to allow the DEFIANCE to pass, but having only a 700 horsepower engine, she was unable to make headway against the extremely strong current and was helped through by the DAN J. HOGAN. (S.Ex. No.13) Although the stern of the NATIONAL IDEAL was protruding into the channel beyond the fender and blocking about a third of the channel, the DEFIANCE and the HOGAN had no trouble getting by tied side by side. The HOGAN is a twin screw vessel with 2,800 horsepower, and is 100 by 35 feet. The HOGAN was light, that is, had no barges in tow, and was also westbound in the Waterway. The Bridge was lowered at 9:22, and as soon as the DEFIANCE was out of the current, about a half mile west of the Bridge, the HOGAN turned to assist the NATIONAL IDEAL.

17. When the HOGAN came to the NATIONAL IDEAL's assistance, Wiley told the HOGAN to hold the tow while he attempted to rotate the NATIONAL IDEAL so that her bow would face the tow and where she would be in a position to help move the tow. The HOGAN put a line from the port forward quarter of the HOGAN to the stern of the port side of the tow's spiked barge. As the tow was situated, there was no other way for the HOGAN to get a line to the tow without heading straight in and exposing its side to the current and getting crossways in the channel. The HOGAN came in parallel to the barge, and caught the tow on her hip, with her bow facing toward the stern of the tow and westward in the channel. The HOGAN was going slow ahead on her starboard engine while the NATIONAL IDEAL attempted her pivot.

18. Exactly what occurred next is in dispute, as is the time sequence in which it occurred. The Court finds that due to Captain Wiley's failure to adequately plan the flotilla's removal from the fender, the captain of the HOGAN was not properly informed as to the NATIONAL IDEAL's intentions and intended actions. The captain of the HOGAN thought that his only responsibility was to hold the tow in place and off the Bridge while the NATIONAL IDEAL turned to a position where she would be able to exert her power to move the tow, and then to work in concert with the NATIONAL IDEAL in moving the tow back into the channel and out of the current where the NATIONAL IDEAL would be able to get in position for another approach to the Bridge. However, the NATIONAL IDEAL was unable to turn to face her tow, and cast off all lines to her tow and began to try to ease around the corner of the·tow to attempt to make up to the side of the barge opposite the HOGAN. The NATIONAL IDEAL failed to keep a line on the tow or to station a crew member on the barge to take a line while she was warping around the corner. When the NATIONAL IDEAL with its deep draft was removed from the stern of the tow, the entire flotilla began to move out into the channel as a result of the HOGAN's movement and the force of the current and wind. As the tow moved from behind the fender, it also damaged the northwest dolphin and pier system, but at exactly what point along its movement this happened is not clear. (S.Ex.No.11, p. 2) The HOGAN continued to apply power against the tow in an effort to keep it from being set back into the draw of the Bridge. In the manner in which she was made up, the HOGAN was unable to control the tow. The captain of the HOGAN notified Wiley that he was not able to control the tow without help from the NATIONAL IDEAL, and that he needed assistance immediately. The HOGAN could not use more power because due to the way

---

3. The word "bent" as used here is a civil engineering term which refers to the pilings, support bars and braces which are transverse to and support the roadway slabs at regular intervals.

she was made up to the tow the captain feared that this would have turned the tow crossways into the current and have set the entire flotilla lengthwise into the Bridge. The flotilla drifted west and then north across the channel for some 760 feet until the HOGAN ran aground on a protective reef near a power line pole. The HOGAN did not engage its other engine until immediately before it ran aground. While it now appears that he should have done this earlier, under the circumstances as they appeared at the time, the captain of the HOGAN was justified in waiting to use his full power. The decision was based upon reasonable considerations and was made under the influence of the sudden danger into which the HOGAN had been thrust by the NATIONAL IDEAL. During this movement Wiley claimed that the NATIONAL IDEAL, although light boat and making top speed, never got close enough to get a line to the tow. This is the fault of the NATIONAL IDEAL itself, as she should have either kept a line to the tow or made sure she was close enough to regain control if necessary. After the HOGAN went aground and stopped, the wind and current swung the tow around to the north until the lead barge hit the Bridge, knocking out an entire support pier and dropping two concrete roadway slabs into the water. (S.Ex.No. 7, N.Ex.No. 11) The striking occurred at 9:50. (S.Ex.No. 13)

19. The instances of negligence on the part of the NATIONAL IDEAL are manifold. Whether the NATIONAL IDEAL should have considered attempting the passage under the existing weather conditions is in itself extremely questionable. Knowing that it and its tow would occupy the major portion of the entire channel, failing to check with the bridgetender or with other vessels for oncoming traffic was certainly negligent. The failure to request the JENNIFER to hold up and allow the NATIONAL IDEAL to clear the Bridge is also questionable. When it was learned that the JENNIFER was oncoming, the NATIONAL IDEAL could have held up and not have attempted passage until the JENNIFER was well west of the Bridge. The NA-

TIONAL IDEAL could also have grounded its barges on the mud flats on the south side of the channel and waited until the tide and weather conditions improved. As it turned out, none of these options were chosen, and the NATIONAL IDEAL continued its approach, left the channel due to its own momentum and entered upon the chain of events which led, finally, to its tow striking the Bridge.

20. Once against the southwest fender system, and knowing that there was still room for westbound traffic to clear the Bridge, the NATIONAL IDEAL could have remained there until the weather conditions improved. Having decided to move the flotilla off the fender, Captain Wiley as captain of the vessel requiring and requesting assistance was in charge of the maneuver. By failing to properly plan the maneuver about to be undertaken and inform the HOGAN of the NATIONAL IDEAL's contemplated actions and the HOGAN's participation in that maneuver, the NATIONAL IDEAL created a situation of a high degree of risk to the Dauphin Island Bridge, the HOGAN and indeed, to the NATIONAL IDEAL itself. Casting loose from its tow under the circumstances further aggravated the situation.

21. While the Court is not attempting to state any general rule of law concerning passage of the Dauphin Island Bridge, it is the finding of the Court that under the circumstances of this case the actions of the NATIONAL IDEAL constituted negligence. The emergency ultimately created was solely a result of this negligence. The Court finds the NATIONAL IDEAL at fault for both allisions and solely liable for any ensuing damage to the Dauphin Island Bridge.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this cause by virtue of its admiralty and maritime jurisdiction. 28 U.S.C. § 1333; 46 U.S.C. § 740. The Court also has personal jurisdiction over all of the parties.

2. The Dauphin Island Bridge and its fender system were built in accordance with permits from the U.S. Army Corps of Engineers and the Coast Guard and thus were not unreasonable obstructions to navigation. 33 U.S.C. § 525, *et seq.; Texas & P. Ry. Co. v. Angola Transfer Co.,* 18 F.2d 18 (5th Cir. 1927), cert. den. 275 U.S. 534, 48 S.Ct. 30, 72 L.Ed. 412 (1927); *State of Oregon v. Tug Go-Getter,* 299 F.Supp. 269 (D.Ore.1969), rev'd in part on other grounds, 468 F.2d 1270. The State of Alabama was not negligent in the design, construction, modification or maintenance of either structure.

3. Plaintiff seeks the benefit of the rule which imposes a presumption of negligence on a moving vessel which strikes a stationary object. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895). This presumption is sufficient to establish a *prima facie* case of negligence against the moving vessel. *Petition of M/V Elaine Jones,* 480 F.2d 11 (5th Cir. 1973), 513 F.2d 911 (5th Cir. 1975), cert. den. 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60; *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.,* 377 F.2d 724 (5th Cir. 1967). The presumption extends to all parties participating in the management of the striking vessel at the time of contact. *Merrill Trust Co. v. Bradford,* 507 F.2d 467 (1st Cir. 1974); *Patterson Terminals, Inc. v. S. S. Johannes Frans,* 209 F.Supp. 705 (E.D.Pa.1967). This presumption may not be applicable in some cases involving a drawbridge which is required to be raised to accommodate water traffic. *U. S. v. Sabine Towing and Transportation Co.,* 289 F.Supp. 250 (E.D.La. 1968). However, the presumption appears to the Court to be applicable in this instance due to the fact that the contact here was with the stationary fender system, *Louisville & Nashville R. Co. v. M/V Ciudad DeTurbo,* 330 F.Supp. 769 (S.D.Ala.1971), and a stationary portion of the roadway of the bridge. The fact that the bridge was a drawspan had no causal relation to the incident. The DAN J. HOGAN has rebutted this presumption as applied to it by adducing sufficient evidence to place the fault solely on the NATIONAL IDEAL. *St.*

*Louis-San Francisco Railway Co. v. M/V D. Mark,* 243 F.Supp. 689 (S.D.Ala.1965).

4. Under the circumstances, the JENNIFER had a right to a port-to-port passing, and was under no duty to relinquish this right to the NATIONAL IDEAL. 33 U.S.C. § 210. Any violations by the JENNIFER of 33 U.S.C. § 221, (the requirement of a lookout) or 33 U.S.C. § 210, (the requirement to stay to the starboard side of the channel in a narrow channel passing) were inconsequential, and were not a contributing cause of either allision. *Hess Shipping Corp. v. S.S. Charles Lykes,* 285 F.Supp. 412 (S.D.Ala.1968), aff'd 417 F.2d 346, 424 F.2d 633, cert. den. 400 U.S. 853, 91 S.Ct. 56, 27 L.Ed.2d 91, reh. den. 400 U.S. 931, 91 S.Ct. 184, 27 L.Ed.2d 191 (1970).

5. The NATIONAL IDEAL was, under the circumstances then existing, negligent in entering the Pass Aux Herons Channel without first checking traffic conditions on both sides of the Dauphin Island Bridge, particularly since it was planning an approach and passage which would necessarily cause it to occupy the greater part of the channel. This negligence on the part of the NATIONAL IDEAL was the sole and proximate cause of the first allision, and played an important part in the second, since any collision or navigational difficulty which occurred that close to the Bridge would clearly create a substantial danger of an allision with the Bridge.

6. The NATIONAL IDEAL was negligent in neglecting to make an adequate arrangement to use the DAN J. HOGAN in the attempt to remove itself from the Bridge. No advance consultation was had, and no provision for proper communication was made by the NATIONAL IDEAL. Further, the NATIONAL IDEAL gave completely inadequate instructions and information to the HOGAN during the entire maneuver. This negligence, combined with the prior negligence noted above which originally placed the NATIONAL IDEAL in the awkward position on the Bridge Fender, was the cause of the second and more serious allision. Far from defeat-

ing the presumption created by its striking the Bridge by establishing that it was free from fault or had a defense, *Ernest Construction v. Tug Commodore,* 294 F.Supp. 15 (S.D.Ala.1968); *Georgia Ports Authority v. L/S Bilderdyk,* 402 F.Supp. 706 (S.D.Ga. 1975), the evidence affirmatively establishes that the striking of the Dauphin Island Bridge was a direct result of the negligence of the NATIONAL IDEAL.

■ 7. The NATIONAL IDEAL, by casting its tow completely free while the HOGAN was in no position to control it, placed the HOGAN *in extremis.* This condition arose at the moment the tow was freed by the NATIONAL IDEAL and continued until the barge struck the Dauphin Island Bridge. Therefore any errors made by the HOGAN in the agony of almost certain collision with the Bridge or any other structure in the area must be considered as having been caused by the NATIONAL IDEAL, and the HOGAN will not be held liable for such errors. *The Stifinder,* 275 F. 271 (2nd Cir. 1921); *The Chicago,* 125 F. 712 (2nd Cir. 1903); Griffin, The American Law of Collision, 1949, §§ 233–235; Gilmore and Black, The Law of Admiralty, 2nd Ed. 1975, § 7–3.

8. The NATIONAL IDEAL is solely and entirely liable for any damage resulting from either the first or second allision with the Dauphin Island Bridge on November 20, 1975.

9. National Marine's counterclaim is DISMISSED.

A judgment in accordance herewith will be entered.

[See following illustration]

APPENDIX A

TRANSMISSION LINE TOWER

146.9'

MOBILE ℄ BRIDGE

2-SPANS DESTROYED

BENT DESTROYED No 225

763.4'

389.1'

7-PILE DOLPHIN

BRIDGE PIERS

FENDER SYSTEM

7 PILE DOLPHIN

Center of Joint

8502'

LIFT SPAN

180.37 CLEAR 45.8 45.8 FACE TO FACE WALES

Center of Joint

7-PILE DOLPHIN

FENDER SYSTEM

7-PILE DOLPHIN

BRIDGE PIERS

185'

DAMAGED PILING ON BENT No 242

BRIDGE

DAUPHIN ISLE

100   0   100

SCALE IN FEET